WALTER H. WATSON *vs.* INHABITANTS OF NEEDHAM.

Norfolk.     March 19, 1894. — May 18, 1894.

Present: HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Constitutional Law — Eminent Domain — Breach of Contract — Damages.*

A town acting through its water commissioners may legally contract to furnish a person with water for use in a boiler to make steam to heat his greenhouse.

At the trial of an action for breach of contract by a town to furnish a person with water for use in a boiler to make steam to heat his greenhouse, it appeared that in the regulations which were made part of the contract the right to shut off the water in all cases when it became necessary to make extensions or repairs, and whenever the commissioners deemed it expedient, was expressly reserved. There was evidence tending to show that the damage to the plaintiff was not caused by the exercise of this reserved right, but by a leak which remained undiscovered until after the standpipe had been emptied and there was no longer any pressure in the service pipes; and the inference was warranted that due diligence was not used to discover such leaks quickly, to shut off the flow of water to the place of the leak, and to start pumping engines so as to prevent the standpipe from being emptied. *Held,* that the court might properly find a breach of the contract.

In an action against a town for breach of contract to furnish the plaintiff with water for use in a boiler to make steam to heat his greenhouse, whereby injury was caused to his growing crop of lettuce by freezing, the ruling that the plaintiff is entitled to recover the full amount of damage is correct.

CONTRACT, to recover damages for injury to the plaintiff's growing crop of lettuce, situated in his greenhouse, caused by freezing.

At the trial in the Superior Court, without a jury, before *Blodgett,* J., there was evidence tending to show that the water supply of the defendant town was located within the town, and a standpipe was established to furnish the necessary pressure, and the water was raised from the source of the supply, which was about a mile from the village, by pumping, for the purpose of filling the standpipe, and causing the water to circulate through the system of pipes; that the plaintiff was the proprietor of a greenhouse in which lettuce was raised, which greenhouse was heated by steam generated in a boiler under the same, and circulated through pipes; that the boiler was supplied with water from the street main of the defendant town, and was communicated from the main to the boiler of the plain-

tiff by a service pipe; that the service pipe upon the premises of the plaintiff was provided by him with a shut-off or gate, which was under his control and management; that when it became necessary to pass water into the boiler, the shut-off or gate was opened by the plaintiff, and the water was forced by the pressure in the street main into the boiler, and when a sufficient supply had been thus obtained the shut-off was closed, and remained closed until an additional supply in the boiler became necessary; that after the establishment of the system of water works, the plaintiff applied to the water commissioners for a water supply for said greenhouse, which was granted, and the connection made with the street main, as before stated; and that water had continued to be so supplied up to the time of the accident hereinafter referred to, for which the plaintiff had paid $10 in advance, and from time to time the stipulated rates, in part in advance each time of payment, as set forth in the town regulations, which were as follows:

" The following regulations, until further notice, shall be considered a part of the contract with every person supplied with water.

" 1. All applications for service pipes and water must be made at the office of the water commissioners, and state fully the purposes for which the water is to be used. Water will not be introduced into any building or premises except on the written application of the owner thereof, or by a duly authorized agent. . . .

" 3. The regular rates for the use of the water shall be payable in advance to the town treasurer on the first days of June and December of each year, except where water is supplied by special agreement. . . .

" 11. The commissioners reserve the right to restrict the use of hose or fountain, to shut off the water in all cases when it becomes necessary to make extensions or repairs, or for violation of any of the regulations, or whenever they deem it expedient.

" Measured water. Where water is measured, the consumer must provide and keep in repair at his expense a meter of a pattern approved by the water commissioners. Where a meter is put in for the purpose of measuring the water used by the con-

sumer, a minimum water rate, to be paid in advance, will be charged, which will cover the cost of a certain yearly quantity of water, and all water drawn in excess of such quantity shall be paid for by the thousand gallons. Where a meter is put in for the above purpose, the minimum annual rate shall in no case be less than ten dollars.

" Meter rates. A consumer using not more than 100,000 gallons of water per annum shall pay (semiannually in advance) a minimum annual rate of ten dollars, which payment shall entitle him to use forty thousand gallons of water per year for one year, and thirty cents for each and every thousand gallons of water drawn in excess of this quantity."

There was no contract in writing between the plaintiff and the town or the water commissioners, in respect to the furnishing of a supply of water to the plaintiff, except such as appears from the application and license granted under and by said regulations.

The plaintiff testified that he was informed by Mosley and Hodge, two of the water commissioners, that he could have all the water he wanted ; that he afterwards had a talk with one Leonard, who superintended the construction of the water works and at that time the management, in which Leonard informed him that he could have water, and advised him to put in a meter, in reply to the plaintiff when he proposed to put in another well if a regular and sufficient supply could not be obtained from the town ; and that an application in writing was made by the plaintiff to the commissioners for water, and a connection of the town water pipes was made with the boiler of the plaintiff and water supplied, $10 paid in advance, and other bills paid as required by the regulations.

The foregoing was all the evidence relating to the contract between the plaintiff and the defendant town, except the regulations referred to.

The plaintiff further testified, that on February 7, 1893, at six in the afternoon, he went down stairs to fill his boiler and started the water by opening the gate or shut-off, the boiler being then nearly half full of water, being the way the boiler was usually left during the daytime, during which time no steam was needed for heating purposes, and that this was

the usual time and ordinary manner of running the boiler and filling the same; that he went into the house and was gone about three minutes, and then found that the water had ceased to flow through a faucet in his house; that he then went to the boiler and put his hand on the pipe near the check valve, found that it was warm on the boiler side thereof, closed the supply gate at the boiler, and then found that no water ran through the meter by opening and closing its supply gate, which indicated that the trouble was outside of the plaintiff's premises; that the water was just in sight in the glass tubes, and that he thereupon banked his fires, and on inquiry learned from Leonard that there was a leak in the pipes in the town, and he could not tell when he could have water, but could have it before morning; that it was unsafe to run his boiler longer without further supply of water; that he had no notice of any intention to shut off the water, and could not make connection with his private supply at that season of the year in less than a day's time; that he could have filled the boiler in less than half an hour then if water had been supplied; that at twenty minutes past ten the water again commenced to run; that at twenty minutes to eleven, when he had water enough to fill his boiler, the lettuce was frozen badly; that part of it was entirely destroyed, and a part injured; that the failure of the water was caused by the opening of a joint underground at a hydrant on Central Avenue, about one mile from the centre of the village, and in a different direction from the pumping station, by the partial forcing off of the hydrant from the pipe to which it was connected, said connecting pipe having a six-inch discharge; that about three to five hours' pumping in each twenty-four hours was sufficient to furnish a supply of water and keep the proper pressure maintained; and that the water commissioners were engaged in other business, except Hodge, who had charge of the pumping station, and were accustomed to meet once a week at this time for business connected with the department, and oftener if necessary.

Hodge testified that he received notice that something was wrong while on Highland Avenue at 6.15 P. M.; that he then went to the pumping station, and found that the pressure was down, which indicated a leak; that he went with the team to find

Leonard, and met him near Highlandville; that Leonard proceeded to find the leak, which was located on Central Avenue, and as soon as practicable closed the shut-off gates on each side of the break; that he did not start the pump till receiving notice of the closing of these gates; and that there was more or less ice on the ground, rendering it more difficult to find and close the gates. Hodge also testified that the pumps were started at 8.35 o'clock the same evening, and in about half an hour got pressure, which showed that the mains were then full.

Both Hodge and Leonard testified that the break was found, gates closed, and pumping resumed as rapidly as practicable. Leonard further testified that he first learned of the leak about 6.30 P. M., when he started to find it, and located it about an hour later; that he had some difficulty in finding the shut-off gates on each side of the break, whose location was shown by plates on the surface of the ground, but succeeded in doing so about eight o'clock; that there was a plan at the office of the commissioners, showing the exact location of all pipes, hydrants, and shut-off gates throughout the town; that he did not take this or send for it during the search, nor did he take any assistant; and that when the gates were shut off on each side of this hydrant, which were not far apart, water could be circulated through the rest of the system of pipes and standpipe in the town, and that no attempt to do so was made until after these gates each side of the hydrant were found and shut off.

It further appeared in evidence, and was uncontradicted by any direct testimony, that at this time there were only two gauges in the town which showed the height of water in the standpipe and the pressure in the supply pipes, one of which was at the pumping station, and the other at the residence of Hodge; that Hodge was not at his residence during that afternoon; and that he left the pumping station that afternoon at 3.20 o'clock, when he said everything seemed all right; and that the standpipe was full.

Expert evidence was also introduced, without objection, which was uncontradicted, in regard to the capacity of the Needham Water Works, being a written statement made by E. Worthington, Jr., civil engineer, which contained, among other things, the following:

"The hydrant in question, located 500 feet northerly of the junction of Central Avenue and Nehoiden Street, and upon Central Avenue, Needham, is supposed to be entirely disconnected from its six-inch branch pipe, and the water allowed to discharge freely through this six-inch aperture.

"The Needham standpipe is supposed to be full at the time of disconnection. The questions are: First, How long would it take to empty the standpipe by allowing this aperture to remain open? Secondly, Would the pumping plant at the Needham station be able to keep up with the flow through this six-inch aperture, and thus prevent any loss of water stored in the standpipe? To the first question my answer is, that it would take about five hours and seventeen minutes to exhaust the entire contents of the standpipe through this six-inch aperture, allowing the standpipe to be filled to the extreme top, or eighty-five feet. When filled to the ordinary high-water mark, or eighty-two feet, the time required would be five hours and seven minutes nearly. There would still remain some water in the piping system which would require perhaps an additional half-hour to exhaust through the outlet in question. To the second question my answer is, that, with both pumping engines in motion at their rated speed and capacity, they would be able to balance the leakage through the given aperture when forty feet, or about one half the standpipe, had been drawn off, and that the pumps would then maintain the pressure in the supply pipes, plaintiff's boiler, and this half-tank full, under your given conditions, without further loss in storage.

"The data from which these results were obtained are taken from the water commissioners' reports, and from facts obtained by me at their office in Needham.

"The pumping plant consists of two pumping engines whose combined capacity is 1,000 gallons per minute when delivering into the standpipe."

The defendant asked the judge to rule that the plaintiff could not maintain this action. The judge declined so to do; and the defendant excepted.

The judge found that the plaintiff was entitled to recover the full amount of damage to his lettuce, assessed damages in the sum of $400, and reported the case for the determination of this court.

If the ruling was correct, judgment was to be entered for the plaintiff accordingly ; if the plaintiff was entitled to recover only for the value of the water the defendant failed to supply him, damage was to be assessed in the sum of one dollar ; and if the plaintiff was not entitled to maintain his action, judgment was to be entered for the defendant.

*S. H. Tyng*, for the defendant.

*T. H. Wakefield*, for the plaintiff.

KNOWLTON, J.   The defendant town, acting through its water commissioners, undertook to furnish the plaintiff with water for use in a boiler to make steam to heat his greenhouse.   It is objected that this is a use for which the town had no constitutional authority to take and furnish water, and that the contract was therefore void.

It is true that the right of eminent domain cannot be exercised to take property for a private use, and persons or corporations owning rights in streams or ponds cannot be deprived of their use of the water by an attempt to take it for the use of another merely for purposes of private gain ; but it has long been settled that ponds and streams may constitutionally be taken in the exercise of the right of eminent domain for the purpose of supplying the inhabitants of cities and towns with pure water for domestic and other similar purposes.   *Opinion of the Justices*, 150 Mass. 592.   It may be a matter of some difficulty to determine precisely what uses are included within the public purposes for which water lawfully may be taken.   In regard to uses strictly domestic there can be no doubt.   We are of opinion that other uses are included, such as are fairly incidental to the ordinary modes of living in cities and large towns, and as involve the operation of motors requiring but a small quantity of water which may reasonably be supplied from an aqueduct of such capacity as would be needed to meet the ordinary requirements of the inhabitants for domestic and other similar purposes.   We are of opinion that the use in the present case was one for which the town might legally furnish water.

The terms of the contract were not expressed in full, but were left in part to implication.   In construing the contract, we must consider the situation of the parties and their relation to the subject with which they were dealing.   The town was acting in

the performance of a public duty in supplying water for public use, and incidentally was making contracts with individuals adapted to the circumstances of each particular case. It would not be expected to guarantee a supply of water against all contingencies, but only to guarantee proper effort to insure a constant supply. In the regulations which were made part of the contract the right to shut off the water in all cases when it becomes necessary to make extensions or repairs, and whenever the commissioners .deem it expedient, was expressly reserved; subject only to that reserved right, the town was bound to use reasonable care and diligence to have ready for delivery a sufficient supply of water for the plaintiff's use, so long as the contract remained in force. *Merrimack River Savings Bank* v. *Lowell*, 152 Mass. 556.

There was evidence from which the court was warranted in finding a breach of this contract. The damage to the plaintiff did not result from the exercise of the reserved right to shut off the water. It was caused by a leak which remained undiscovered until after the standpipe had been emptied, and there was no longer any pressure in the service pipes. The testimony of the expert, and the other facts of the case, warranted the inference that due diligence was not used to discover such leaks quickly, and to shut off the flow of water to the place of the leak, and to start the pumping engines so as to prevent the standpipe being emptied.

It was not contended that the plaintiff was in fault, nor that the town should be relieved from liability on the ground that it was not accountable for the neglect of the water commissioners. *Hand* v. *Brookline*, 126 Mass. 324. *Neff* v. *Wellesley*, 148 Mass. 487.

The ruling in regard to the amount of damages recoverable was correct. *Stock* v. *Boston*, 149 Mass. 410.

*Judgment on the finding.*