# CHARLESTON.

WIGAL, ADM'X. *v.* CITY OF PARKERSBURG.

Submitted February 18, 1914.    Decided April 7, 1914.

1. WATERS AND WATER COURSES—*Water Works—Liability of City for Negligence.*

 A municipality maintaining a waterworks system for supplying its inhabitants with water for domestic use, is not thereby performing a governmental function, and is liable for acts of negligence respecting such business just as a private individual. (p. 27).

74 W. Va.

2. SAME—*Waterworks—Liability of City for Injuries.*

A city is liable for injury caused by the breaking of its tank or reservoir in which it has collected water in large quantity to supply its waterworks system.   (p. 27).

3. SAME—*Torts—City Waterworks—Presumption of Negligence.*

In the absence of proof that the breaking of the tank was caused by some superior force, such as an unusual and violent disturbance of the elements or an explosion clandestinely caused, negligence will be inferred from the breaking.   (p. 31).

4. SAME—*Torts—City Waterworks—Liability for Injuries.*

Restriction upon a city by. its charter in the rate of water rent which it may lawfully charge consumers, does not affect the question of its liability.   (p. 30).

5. APPEAL AND ERROR—*Harmless Error—Exclusion of Evidence.*

It is not reversible error to exclude expert testimony presenting a possible, but highly improbable, theory, not based on any particular facts in support thereof, especially if such testimony conflicts with other direct testimony negativing such theory.   (p. 32).

6. DEATH—*Damages Recoverable—Mental Anguish.*

In an action to recover for wrongful death, the jury are not limited to mere pecuniary damages, but may allow for mental anguish and suffering of near relatives of deceased, who are his distributees.   (p. 33).

7. SAME—*Damages Recoverable—Prospective Losses.*

The damages in such case are not confined to such as may have accrued at the death, but may include such prospective losses to the distributees as the evidence shows will actually and necessarily result from the wrongful .death as the proximate cause.   (p. 35).

Error to Circuit Court, Wood County.

Action by Amanda Wigal, administratrix, etc., against the City of Parkersburg. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Smith D. Turner* and *Wm. H. Wolfe,* for plaintiff in error.

*V. B. Archer* and *Dave D. Johnson,* for defendant in error.

WILLIAMS, JUDGE:

On the 19th of March, 1909, two large iron water tanks, sixty-five feet in diameter and forty feet high having a capacity of one million gallons each, constructed and main-

tained by the City of Parkersburg, burst and the water flowed down the hill in such volume and with such velocity as to demolish a dwelling house and kill plaintiff's intestate who occupied it.  For its alleged negligence in causing his death, his administratrix sued the city and recovered a judgment for $3000.00, and it has brought the case here on writ of error.  A number of errors are assigned as cause for reversal.  The principal one relates to the court's ruling upon the law respecting the liability of a municipality for the negligence of its servants and officers in the maintenance of its system of waterworks.  Counsel contends that the city was exercising a governmental function and is, therefore, not liable.  While it is true that a municipality is not liable for negligence in performing or failing to perform its purely discretionary or governmental functions, we do not think the maintenance of the water tanks in this case was purely governmental.  The city's charter authorized it to acquire, erect, maintain and operate waterworks, and to sell water to its inhabitants for domestic use.  It maintained its waterworks for the twofold purpose of fire protection and supplying water for the daily consumption of its inhabitants.  It is argued that, inasmuch as the waterworks were maintained in part for fire protection, which is admittedly a discretionary or governmental act, the city is not liable because it undertook to supply and did supply water for domestic use to its inhabitants through the same waterworks system.  But this contention is contrary to the rule that has been adopted by practically all the courts of the country.  Municipalities supplying their inhabitants with water do not maintain separate waterworks for fire protection; water for both purposes is invariably supplied through the same mains.  Neither do they undertake to supply water for domestic use without at the same time providing fire protection.  So that, in every case dealing with the subject of municipal liability respecting the maintenance of waterworks, it may be fairly assumed that the plant was serving a dual purpose; and the rule is that, unless the negligence complained of is the work of extinguishing fires, the municipality is liable on the same principle that a corporation engaged in the same business is liable.  ''The fact that the city may also use the waterworks for protection against fire does not relieve it from

liability for negligent acts of its servants or agents in the conduct of the business, except for such acts as are performed by them in the actual work incident to extinguishing fires.'' *Piper* v. *City of Madison,* 140 Wis. 311. *City of Winona* v. *Botzet,* 169 Fed. 321. Municipal liability for negligence depends upon whether the negligence was in performing a governmental or non-governmental service; if the former it is not liable, otherwise it is liable. A governmental function can not be delegated by a municipality. It can not delegate its legislative power to enact ordinances for the government, regulation and protection of its citizens, nor the power to enforce them. But the business of supplying its inhabitants with material necessities and comforts, such as water, light and street railway service, is not governmental, and yet a municipality may engage in such business when authorized by its charter to do so, or it may authorize it to be done by a private corporation. But when it assumes such duties, its liability for negligence in the performance thereof is the same as that of a private corporation engaging in a similar business. ''A city furnishing water to private consumers acts in a business capacity, and it must exercise the care that ordinarily prudent persons engaged in similar business would exercise under like circumstances, and it is liable for injury to property by water escaping from a broken main, such break being proximately caused by its failure to exercise such care.'' *State Journal Printing Co.* v. *City of Madison,* (Wis.) 134 N. W. 909. Discussing municipal ownership of public utilities, McQuillin, in his work on Municipal Corporations, Vol. 6, Sec. 2680, says: ''Municipal ownership, in the usual and common acceptation of that term, must of necessity carry with it the same duty, responsibility and liability on account of negligence that is imposed upon and attaches to private owners of similar enterprises. For example, it is settled beyond dispute that a municipality which operates its own water, electric light, or gas plant acts in a private and not a governmental capacity and is liable for its negligence in connection therewith.'' The same doctrine is asserted in Dillon on Municipal Corporations, Vol. 4, Sec. 1670. Both writers state the rule without qualification and cite numerous decisions in support of it, many of which we have examined. We cite the following as showing

the various acts of negligence for which municipalities have been held liable, viz: For injury to property by escaping smoke from a pumping station. *Gordon* v. *Silver Creek*, 127 N. Y. App. Div. 888, affirmed in 197 N. Y. 509. For placing a hydrant in the curb of the sidewalk so close that the wheel of a carriage in passing struck it. *St. Germaine* v. *City of Fall River*, 177 Mass. 550. For injury to goods stored in a basement, caused by water escaping from one of the mains when the city's servants negligently undertook to repair a leak before cutting off the water. *Chicago* v. *Selz, Schwabe & Co.*, 202 Ill. 545. A similar case is *Dammann* v. *St. Louis*, 152 Mo. 186. For negligently permitting the supply of water in its waterworks system to become polluted with poisonous substances, so that plaintiff's intestate contracted typhoid fever from using the water, and died in consequence. *Keever* v. *City of Mankato*, 113 Minn. 55. For negligently laying mains and pipes under and across a public highway. *City Council of Augusta* v. *Mackey*, 113 Ga. 64. For injury to property caused by the bursting of a dam negligently built and maintained by the city to form a reservoir to supply its waterworks. *Bailey* v. *Mayor of New York*, 3 Hill 531, 38 Am. Dec. 669. For injury to property caused by water escaping from the city's reservoir—a case like the present one. *Wiltse* v. *City of Red Wing*, 99 Minn. 255. For personal injury resulting from negligent blasting of rock by the city's agents engaged in excavating a trench for the laying of water main. *Collensworth* v. *New Whatcom*, 16 Wash. 224. For negligence in not equipping its water standpipe with a guage, thereby causing it to overflow and frighten plaintiff's horse causing it to run off and throw him out of the buggy and injure him. *Woodie* v. *Town of North Wilkesboro*, (N. C.) 74 S. E. 924. For blowing a whistle connected with the city's fire alarm system, at five o'clock in the evening for the purpose of giving notice to union men and its employes of the end of their day's work, whereby the horses driven by plaintiff's intestate became frightened and ran away, throwing him out of the vehicle and killing him, and injuring a girl who was riding with him. Blowing the whistle for the purpose stated, and not for the purpose of giving the alarm of fire, was held to be actionable negligence for the reason that "the whistle was not blown in

the exercise of the city's power to protect it and its inhabitants against fires, but in the exercise of its power to maintain waterworks, and to care for its own property." *City of Winona* v. *Botzet,* 169 Fed. 321. For personal injury resulting from the city's failure to insulate its electric wire which carried a dangerous voltage. *City of Danville* v. *Thornton,* 110 Va. 541.

The fact that the city was limited by its charter in the rates which it could charge its inhabitants for the use of water to a price sufficient to raise an amount necessary to defray the expenses of building and maintaining its water system, can not affect the case. It is argued that liability depends on the city's making a profit out of the business, and that because it was prohibited from making a profit it is not liable. Actual profit making however is not essential to liability. It rests solely on whether the negligence relates to the performance of a governmental duty, or a duty which could have been performed by a corporate body. Even in case the city had been permitted to make a profit, it would have gone into the city's treasury to be expended for the general benefit of the municipality, and could have had no other effect than reducing the rate of a general property tax. The water rent produced a public revenue which the legislature thought it proper to confine to an amount necessary only to pay for and maintain the waterworks system. It may be that the legislature thought a greater charge than was necessary to raise a sufficient fund for that purpose would result in an unfair discrimination in the city's taxes against consumers of water and in favor of non-consumers thereof, for it is evident that it might be possible for the city to raise all its revenues from that source, by exacting a high water rent, and thereby avoid the levy of a property tax.

Counsel for the city cite and rely on a number of West Virginia decisions, but none of them are authority for the proposition for which counsel contend. The two cases on which they especially rely are *Mendel* v. *Wheeling,* 28 W. Va. 233, and *Ritz* v. *Wheeling,* 45 W. Va. 262. The former was an action against the city for negligently permitting its water mains to get out of repair and become clogged with mud, so that they would not carry sufficient water to extinguish fire,

in consequence whereof plaintiff's furniture factory and stock of goods were burned. That case is clearly distinguishable from the one we are now considering. The negligence there complained of was the city's failure to furnish a sufficient fire protection, held to be a governmental function by all the authorities. In the latter case Sarah Ritz, a child less than five years old, was drowned in the city's reservoir maintained for the dual purpose of fire protection and supplying its inhabitants with water. The decision there rested on the ground that no negligence was shown. The reservoir was surrounded by a high picket fence, and the evidence tended to prove that the child had gone to the reservoir on the hill, and, perhaps, had gotten into the inclosure under the fence through a ditch maintained for the purpose of catching and carrying away the surface water before it could reach the reservoir; or perhaps through a gateway in the fence. The court decided that there was no proof showing want of due care on the part of the city, and, therefore, held it not liable. Those cases are clearly distinguishable from the case in hand. There can be no question that the city of Parkersburg is liable for the death of plaintiff's intestate, if negligence is proven.

Invoking the rule *res ipsa loquitur,* counsel for plaintiff insists that the bursting of the tanks proves negligence. That rule is certainly applicable to this case. In *Weaver Mercantile Co.* v. *Thurmond,* 68 W. Va. 530, decided three years ago, we had occasion to decide this point. The rule being applicable in that case, it must also be applicable in this. That the bursting tank was there owned by a private individual while here the tanks were the property of municipality, can make no difference in applying the rule. The basis for the rule in such cases is, that one who brings water upon his premises and stores it there for his use is liable if it escapes and does injury to the property of another. He is bound at his peril to prevent its escaping and injuring another. Having decided that the city of Parkersburg is liable in this case, on the same ground as a waterworks company, there is no reason to apply a different rule respecting proof of negligence. The tanks were located on a hill at an elevation of about one hundred and eleven feet above the house occupied by plaintiff's intestate. Campbell Neptune who lived not far from the

tanks, testifies as a witness for plaintiff that he was lying awake at five o'clock and, a few minutes thereafter, heard water pouring and supposed the tanks were running over; that just then he heard the tank rip; that it seemed to swing around and crash against the other one, and he heard it split; that he ran to his window which was up and stood there and saw the water come down the hill; that it shot down past the Lutheran Church in a wall which seemed to him about twenty feet high; that just then the city lights went out and he immediately wakened his household and began to dress. It is admitted, however, that if the tanks were destroyed by an act of God, or clandestinely by some explosive, there would be no liability; and counsel for defendant assigns as error the refusal of the court to permit him to read to the jury the deposition of C. F. Kane, which he insists tends to prove that the tanks were dynamited. Kane had had many years experience in boiler making and had repaired the tanks for the city about five years before the accident, and had also inspected them, on the outside, about a year before the accident, but had not seen them from the last inspection until after the accident. He was asked what condition he found the metal in, after the bursting, and says: ''I found one tank in different directions, indicating an explosion by dynamite or some other powerful explosive.'' And when he was asked if the explosion was from the inside, replied: ''Undoubtedly. These sheets were torn the same as you would tear a piece of cloth. It wasn't cut. It was an explosion, I am positive of that. I am just as sure of that as that I am here now. Q. What was the condition of the metal? A. The metal was perfect, or as near as could possibly be from the time they were in use, for the reason that the incrustation of lime protected it.'' The tanks were erected in 1885. It is a well known law of hydrostatics that the pressure of water depends upon its head, or height of column, and that the pressure may be great enough to tear apart even metal walls in which it is confined. Therefore, the torn or broken edges of the metal is not evidence that it was not caused by water pressure. Witness gives no other reason for his opinion that the tanks were dynamited. His testimony was evidently a mere theory based on his general knowledge of the texture of iron and steel, and unsupported by other

facts. He had not seen the inside of the tanks for five years, and the strength of the metal might have been very materially weakened by rust and corrosion during that time. He says the metal was not cut. If he means by that to imply that if the water pressure had destroyed the tanks the edges of the metal would have appeared smooth, as if they had been cut with a sharp instrument, it is common knowledge that that could not be. Moreover, if the tank had been dynamited there would likely have been some indentation in the bottom, or in some portion of the wall nearest the place of explosion. But nothing of that kind is described. Such testimony presents too impossible a theory to be of very material value, and, at most, amounts only to a mere scintilla of evidence which, in view of the direct testimony of Campbell Neptune which negatives the theory of an explosion, is too slight to support a verdict had the evidence been admitted and a verdict been found on it. Neptune testified that he heard the pouring of water before he heard the tanks rip, thus clearly negativing any explosion. Nor is there any evidence of any sound or jarring of the ground, like an explosion. Therefore, while we can not say that Kane's testimony concerning an explosion was propely excluded, yet it is apparent that the exclusion of it was not prejudicial.

It was not error to permit plaintiff, the mother of deceased and one of his distributees, to answer the following question, viz: "Q. Tell the jury what, if any, affect as to grief and worry the death of Walter Wigal had upon you? A. I can not tell it, it was too great." Our statute, known as Lord Campbell's Act, copied from the state of Virginia, does not limit the recovery, in an action for death by wrongful act, to pecuniary damages only. It authorizes the jury to "give such damages as they shall deem fair and just, not exceeding ten thousand dollars." The omission of the word *pecuniary* distinguishes the statutes of these two states from the original English act and from the statutes of most other states on the subject; and has been held both by courts of Virginia and this State, to warrant a consideration, by the jury, of the grief and mental distress of a wife on account of the loss of her husband, or of a parent for the death of a child. *C. & O. Ry. Co.* v. *Rogers,* 100 Va. 324; *Portsmouth Street Ry. Co.* v. *Peed,* 102

Va. 662; *Kelley* v. *R. R. Co.,* 58 W. Va. 216. But in those states whose statutes limit the recovery to a pecuniary loss, evidence of wounded feeling or loss of society seems not to be admissible. 8 A. & E. E. L. (2nd Ed.) 926-928.

For the same reason it was not error to give plaintiff's instruction embodied in defendant's bill of exceptions No. 12 which told the jury that, in estimating damages if they should find for the plaintiff, they were not confined to compensative damages for mere pecuniary injuries but might consider the sorrow, the mental distress and the bereavement of the mother and distributees occasioned by the death of deceased and to give such damages as should be deemed fair and just not exceeding ten thousand dollars, the amount sued for. Plaintiff was the aged mother of deceased and partly dependent upon him for her support and his only other distributees were two sisters.

A number of defendant's bills of exceptions were taken to the rulings of the court in sustaining plaintiff's objections to the introduction by defendant of testimony and depositions of certain witnesses, offered for the purpose of proving that defendant had exercised due care both in the construction and in the maintenance of its water tanks. In view of the law making it the absolute duty of a person who collects water upon his premises for his own use, in such quantity as to become a nuisance to others, to so confine it that it will not escape and do injury, proof of any amount of care could not relieve defendant of liability. It was its positive duty to prevent the water from escaping. Apparently the only defense in such a case is proof of a *vis major* as the cause, and as we have before said there is no such proof in this case. Care in construction, inspection and maintenance of the tanks does not relieve. It, therefore, follows that it was not error to give plaintiff's instructions embodied in bills of exceptions Nos. 9 and 10. They state the law correctly and tell the jury that if they believe from the evidence that the bursting of the tanks was the proximate cause of decedent's death then they must find for the plaintiff, and that the city can only excuse its liability by showing that the bursting of the tanks was caused by an act of God or some other superior force, and that the burden of establishing such excuse is upon the city.

Objection is made to another instruction given at the instance of plaintiff which told the jury that, if they found for the plaintiff, they were not limited in estimating the damage "to the loss actually sustained at the precise period of his death, but may include also prospective losses, provided they are such as the jury believe from the evidence shall actually result to the distributees as the proximate damages arising from the wrongful death." This is the law as stated by this court in point 3 of the syllabus, *Searle* v. *Railway Co.,* 32 W. Va. 370. The instruction is copied almost literally from the latter point of that syllabus.

It follows from what we have said concerning the city's duty to keep the water securely confined, that it was not error to refuse five certain instructions asked for by defendant and embodied in its bills of exceptions Nos. 13, 14, 15, 16, and 17. These instructions are framed on the theory that the city's liability depended altogether upon proof of want of due care on the part of its officers and servants in inspecting and caring for the tanks. The bursting of the tanks thereby causing the death of plaintiff's intestate, as to which facts there is no controversy, in the absence of proof that it was caused by some *vis major,* entitled plaintiff to recover damages.

The court likewise refused to give two other instructions, asked for by defendant, set out in bills of exceptions Nos. 18 and 19, which would have told the jury not to consider the wounded feelings, grief and sorrow of his relatives in estimating damages. This was not error for reasons already given. The court did not err in refusing defendant's instruction embodied in bill of exceptions No. 20. It would have told the jury to find for the defendant, if they believed the bursting of the tanks was caused "by some person or force outside of and beyond the control of the defendant." There was no evidence to support this instruction. Kane's deposition, which we have said could not have supported a verdict for defendant, if the jury had so found, was excluded.

The judgment is affirmed.

*Affirmed.*