## CITY OF HUNTINGBURG *v.* MORGEN.

[No. 12,970. Filed June 29, 1928. Rehearing denied November 15, 1928. Transfer denied January 9, 1930.]

*Elbert M. Swan, Robert W. Armstrong* and *Milton B. Hottel*, for appellant.

*Leo H. Fisher, Bomar Traylor, W. E. Cox* and *W. C. Mason*, for appellee.

McMahan, J.—This is an action by Peter Morgen against the city of Huntingburg for damages occasioned by reason of the failure of the city to furnish him water in a sufficient quantity and pressure, by reason of which a large number of greenhouse plants and products were damaged and destroyed.

The complaint alleges that plaintiff had for many years been engaged in the business of propagating, growing and selling flowers in the city of Huntingburg, and, for that purpose, owned and maintained nine greenhouses, all under glass, and controlled and heated by a system of steam boilers and pipes, and a refrigerator plant, automatically operated and controlled by water motors, where he stored and preserved cut flowers for shipment; that in the winter of 1923, and in the spring of 1924, he had many thousands of plants; that, in growing flowers and plants, one of the most destructive pests

which he was required to combat was a small red spider, the only practical way of combating and destroying it being by chilling, killing and blowing it off by the forceful spraying of water at least three times a week, at which time it was necessary to have a pressure of 60 pounds to the square inch through the water hose and nozzle; that it was necessary to have the same pressure to force water into his boilers for heating and generating steam; that the defendant city then, and for more than 20 years had owned, operated and maintained for gain and profit, upon a published schedule of meter rates approved by the Public Service Commission, a public water system consisting of lakes, reservoirs, steam engines, electric pumps, standpipes, and water mains, sufficient to furnish by natural gravity a pressure of at least 60 pounds per square inch upon all water in its mains; that the city attached to the water pipe leading to plaintiff's place of business a water meter that measured the quantity of water used; that, for 13 years, defendant had continuously supplied him with water at a pressure of not less than 60 pounds to the inch, for which he had paid the city $40 per month; that the city agreed to continue supplying his place of business with all water and pressure necessary; that the city knew and understood that a failure to furnish plaintiff with such water and pressure would result in irreparable loss and damage to him; that he relied upon, and at all times needed, such water and pressure, which fact the city knew; that on March 14, 1924, defendant, negligently and without any warning to him, caused the water pressure in the water pipes and water hose at his place of business to be stopped so that no water would run through them, all without any fault on his part; that such want of pressure was caused by defendant connecting the water main that supplied his place of business with a new standpipe of the Southern Railway, in which

it was intended to store a large quantity of water to supply the wants of the railway company; that the opening into the standpipe of the railroad was four inches in diameter, and that it took six hours continuous running of water to fill such standpipe; the connection with the railway's standpipe was so constructed as to work automatically, and was lower than plaintiff's place of business; that the opening into the main that supplied appellee's place of business was but two inches in diameter, and that, as soon as the railway began to use the water, plaintiff was unable to procure any water from defendant's water mains; that plaintiff immediately informed defendant of that fact, and that his growing plants would be damaged and ruined unless water pressure was at once and continuously furnished him, but that, for a period of 13 consecutive days, defendant negligently refused and failed to furnish plaintiff with any water of the required pressure; that later appellant furnished appellee with water but that it at times failed to supply the pressure regularly and constantly as his business required; and that, by reason of such neglect, appellee was, without negligence on his part, greatly damaged.

A motion to make more specific, to strike out parts, and a demurrer to the complaint being filed and overruled, the cause was put at issue, tried by jury and a judgment rendered against appellant for $9,000. The errors assigned relate to the overruling of the demurrer to the complaint and the motion for a new trial.

Appellant, acting upon the assumption that the cause of action is predicated upon an implied contract between appellant and appellee, whereby the former was obligated to furnish the latter with water, and to furnish such water at a specific pressure, insists that the court erred in overruling the demurrer to the complaint. The record, however, clearly shows that

appellant, appellee, and the trial court construed the complaint as being a complaint for damages occasioned by reason of the negligence of appellant, and that the cause was tried upon that theory. That being the theory adopted by the parties and the court in the trial of the cause, that theory will be adhered to on appeal. The sufficiency of the complaint to withstand a demurrer and the sufficiency of the evidence to sustain the verdict, will, therefore, be considered by this court and determined upon the theory that the complaint is predicated on negligence.

Appellant's contention is that, in furnishing water to its inhabitants, it was acting in its governmental capacity and, in the absence of a statute or order of the Public Service Commission, it is not liable to appellee for failure to furnish him water. The cases cited by appellant, and on which it mainly relies, are chiefly cases where a municipal corporation or a public utility company holding a franchise from the municipality had been sued for damages by reason of loss of property by fire by reason of insufficient water pressure or defect in the fire prevention system.

It is generally held that a municipal corporation, in enacting an ordinance for protection against fire and in the maintenance of a fire department and system of water works for that purpose, acts in a governmental capacity in the general interest of the community, and that the municipality is not liable to a property owner for damages caused by fire. Nor is a public utility company, owning and operating a system of water works for the furnishing of water to private consumers, and for the protection of the public from fire, under a franchise or contract with the municipality, liable to a property owner for loss of property by fire caused by insufficient water pressure. *Fitch* v. *Seymour Water Co.* (1894),

139 Ind. 214, 37 N. E. 982, 47 Am. St. 258; *Trustees, etc.,* v. *New Albany Water Works* (1923), 193 Ind. 368, 140 N. E. 540, 27 A. L. R. 1274; *Larimore* v. *Indianapolis Water Co.* (1926), 197 Ind. 457, 151 N. E. 333; *Wright* v. *City Council of Augusta* (1886), 78 Ga. 241, 6 Am. St. 256. A city maintains waterworks for the twofold purpose of fire protection and for supplying water to its inhabitants for daily consumption. As to the city's liability for the default or negligence of its employees in maintaining such waterworks, there is a clear line of demarcation between its liability, depending upon the purpose for which the water system is being used.

The first purpose, that of fire protection, is clearly a discretionary or governmental act. For the default or negligence of the city's employees in relation to fire protection, the city is not liable. However, in supplying water to the inhabitants of the city for daily consumption, the well-established rule is that the city is liable on the same principle that a private corporation engaged in the same business is liable.

*Wigal* v. *City of Parkersburg* (1914), 74 W. Va. 25, 81 S. E. 554, 52 L. R. A. (N. S.) 465, was an action for damages caused by the negligent construction and maintenance of two large iron water tanks which burst, killing appellant's intestate. In holding the city liable, the court said: "It is argued that, inasmuch as the waterworks were maintained in part for fire protection, which is admittedly a discretionary or governmental act, the city is not liable because it undertook to supply and did supply water for domestic use to its inhabitants through the same waterworks system. But this contention is contrary to the rule that has been adopted by practically all the courts of the country. Municipalities supplying their inhabitants with water do not maintain separate waterworks for fire protection; water for both purposes is invariably supplied through the same

mains. Neither do they undertake to supply water for domestic use without at the same time providing fire protection. So that, in every case dealing with the subject of municipal liability respecting the maintenance of waterworks, it may be fairly assumed that the plant was serving a dual purpose; and the rule is that, unless the negligence complained of is the work of extinguishing fires, the municipality is liable on the same principle that a corporation engaged in the same business is liable."

*Piper* v. *City of Madison* (1909), 140 Wis. 311, 122 N. W. 730, 25 L. R. A. (N. S.) 239, 13 Am. St. 1078, was an action by appellant for damages caused by water flowing into the basement of his store from a defective water tower of the city, and damaging the stock of goods therein. In holding the city liable, the court said: "The function of a city in selling and distributing water to its citizens is of a private nature, voluntarily assumed by it for the advantage of the people of the city. Responsibility for the acts of persons representing it in such a business falls upon the city through the relation of master and servant, and the maxim of *respondeat superior* applies. Whenever this relation is established, the city is liable in damages for the negligence of its agents and servants in the conduct of such business. The following adjudications uphold this liability upon the ground that the city in conducting such a business is acting in its proprietary capacity: *Lynch* v. *Springfield*, 174 Mass. 430, 54 N. E. 871; *Hourigan* v. *Norwich*, 77 Conn. 358, 59 Atl. 487; *City of Chicago* v. *Selz, Schwab & Co.*, 202 Ill. 545, 67 N. E. 386; *Bullmaster* v. *St. Joseph*, 70 Mo. App. 60; *Philadelphia* v. *Gilmartin*, 71 Pa. St. 140. The fact that the city may also use the waterworks for protection against fire does not relieve it from liability for negligent acts of its servants or agents in the conduct of this business, except for such acts as are performed by them

in the actual work incident to extinguishing fires."

*Woodward* v. *Water District* (1917), 116 Me. 86, 100 Atl. 317, L. R. A. 1917D 678, was an action to recover damages for the failure of the defendant to furnish the plaintiff with a sufficient and regular supply of water. The shortage of water occurred during the time when the defendant was engaged in pumping water through its street mains into its reservoir. This pumping reduced the pressure and caused a shortage of water. Plaintiff refused to pay the regular and usual rates, but offered to pay for what water he had received. This offer was refused, and defendant shut off plaintiff's water for non-payment of rates. In answer to defendant's claim that it was performing a governmental function, for which it was not liable for its negligence, the court said: "The Federal courts have universally held that the power of a city to construct waterworks is not a political or governmental power, but a private and corporate one, granted and exercised, not to enable it to control its people, but to authorize it to furnish, to itself and to its inhabitants, water for their private advantage. *Illinois Trust & Savings Bank* v. *Arkansas City*, 76 Fed. 271; *Pike's Peak Power Co.* v. *City of Colorado Springs*, 105 Fed. 1; *Omaha Water Co.* v. *City of Omaha*, 147 Fed. 1. By what we regard the better reasoning and consequently the greater weight of authority a large majority of the state courts follow the rule laid down in the Federal jurisdiction, namely, that a municipal corporation engaged in the business of supplying water to its inhabitants is engaged in an undertaking of a private nature. . . . As to the liability of municipal corporations when engaged in a corporate, as distinguished from a governmental, exercise of functions, we must hold that the rules of liability applicable to private corporations are applicable to municipal ones also." In summarizing its conclusions the court said: "To summarize,

therefore, we hold that the defendant is not acting in a purely governmental capacity but in a private and corporate one; that its powers, duties and liabilities must be measured by the standards used in determining the powers, duties and liabilities of private corporations doing the same business; that an implied contract existed between it and the plaintiff, for the breach of which, through its own fault, the defendant is liable."

In *McEntee* v. *Kingston Water Co.* (1900), 165 N. Y. 27, 58 N. E. 785, McEntee applied for an injunction to restrain the water company from cutting off the water theretofore furnished by the defendant. Prior to the beginning of this action, the supply of water furnished by the defendant to the plaintiff had lessened in quantity and pressure, and had at times wholly failed. Plaintiff refused to pay a bill rendered to him, and, when defendant threatened to shut off the water supply from plaintiff's premises, this action was commenced. In holding an implied contract existed between the two parties, the court said: "The defendant is a *quasi* public corporation, owing certain duties to the general public, and when it connected the plaintiff's house with its street mains in 1883, and furnished him water with more or less regularity for ten years and more, an implied contract existed to the effect that, if the defendant performed, the plaintiff would pay its rates.

"The duties imposed upon a corporation raise an implied promise of performance. . . . The law supposes that the corporation promises or undertakes to do its duty, and subjects it to answer in a proper action for its defaults, whether of nonfeasance or misfeasance."

*Watson* v. *Inhabitants of Needham* (1894), 161 Mass. 404, 37 N. E. 204, 24 L. R. A. 287, was an action to recover damages to a growing crop situated in a greenhouse by reason of the defendant's breach of contract to supply plaintiff with water for the boilers which gener-

ated steam to heat the greenhouse. In holding the city liable, the court said: "The town was acting in the performance of a public duty. in supplying water for public use, and incidentally was making contracts with individuals adapted to the circumstances of each particular case. It would not be expected to guarantee a supply of water against all contingencies, but only to guarantee proper effort to insure a constant supply. In the regulations which were made part of the contract, the right to shut off the water in all cases when it becomes necessary to make extensions or repairs, and whenever the commissioners deem it expedient, was expressly reserved; subject only to the reserved right, the town was bound to use reasonable care and diligence to have ready for delivery a sufficient supply of water for the plaintiff's use, so long as the contract remained in force."

And the same court, in *Stock* v. *City of Boston* (1889), 149 Mass. 410, 21 N. E. 871, 14 Am. St. 430, held that where a city, in constructing a sewer, negligently uncovers a water pipe and leaves it exposed so that the water in it is allowed to freeze, thus cutting off the supply of a party with whom the city is under contract to furnish water, so that he cannot, by the use of reasonable diligence, obtain a supply from that or other sources, and is thereby injured, he may maintain an action of tort against the city for damages, and need not rely on his action on his contract, as the exposure of the supply pipe is the proximate cause of the injury.

In *Stanley* v. *Inhabitants of Town of Sangerville* (1920), 119 Me. 26, 109 Atl. 190, 9 A. L. R. 348, the court said: "In its corporate capacity as the owner of property held for its profit and advantage, the rights and liabilities of the town are measured strictly by the laws which determine all private rights and liabilities, and under the same conditions as a private corporation."

*Springfield, etc., Ins. Co.* v. *Village of Keeseville* (1895), 148 N. Y. 46, 42 N. E. 405, 30 L. R. A. 660, 51 Am. St. 667, was a case apparently holding a municipality not liable in any case for the failure to furnish proper water. However, the same court, in *Oakes Mfg. Co.* v. *City of New York* (1912), 206 N. Y. 221, 99 N. E. 540, 42 L. R. A. (N. S.) 286, held the city liable, and, in discussing the former case, said: "The complaint in that case, in substance, was that the defendant, having availed itself of the right to maintain a municipal waterworks system operated the latter so negligently and inefficiently that proper fire protection was not afforded, whereby the plaintiff suffered damages. It was held, Judge Gray writing for a unanimous court, that the defendant was acting in a governmental capacity and was not liable. But, of course, that decision and opinion are to be read in the light of the facts which were involved. The village maintained a fire department and concededly in so doing it was discharging a governmental function. As a necessary element in the maintenance of the fire department, it undertook to supply water for fire purposes, and in so doing its character and the nature of the acts which it was performing were not different than they were when it supplied engines or men. It was no more liable because the pipes for supplying water were clogged up or broken than it would have been if one of the engines had become out of repair or an insufficient force of men had been maintained for operating the engine and the water. But in the present case, when in accordance with the powers conferred on it, the city undertook to maintain a municipal water system and to supply water to private consumers at a fixed compensation, it was not acting in such capacity as above stated. It entered on an enterprise which involved the ordinary incidents of a business wherein was sold that which people desired to buy, and which might become a source

of profit, and under these circumstances *it became liable for breach of contract or for negligence as the proprietor of a private business might become.*"  (Our italics.)

*Humphreys* v. *Central Ky. Natural Gas Co.* (1920), 190 Ky. 733, 229 S. W. 117, 21 A. L. R. 664, was an action by appellant, a florist, to recover damages for the loss of plants caused by the failure of the company to furnish an adequate quantity of gas and pressure to protect his plants in cold weather.  The company failed to supply him an adequate quantity of gas for a period of 10 days.  The defense of the gas company was that, in the absence of an express contract, with either the city with whom it had a franchise contract or with appellant, requiring it to furnish any specific quantity, or to furnish such quantity as would maintain any degree of temperature, it was not liable for a failure to supply the amount necessary to maintain the quantity required to maintain the necessary degree of temperature in appellant's greenhouses.  In holding the gas company liable, the court said:  "It cannot be doubted that when this gas company applied for and was granted the right to use the streets and public ways of the city for the purpose of supplying the people in their homes, factories, offices and places of business with natural gas for heating purposes and began the performance of this service, it engaged and undertook to continue the service in such a manner as would reasonably and naturally fulfill the expectations in the minds of the contracting parties when the franchise was granted and accepted, and perform this service in such a manner as was reasonably intended by it and the city when the contract was entered into.  Accordingly, we think that when this gas company obtained a franchise from the city to use the streets and public ways for the purpose of supplying the people of the city natural gas and entered upon the performance of this service it thereby assumed an obligation to exer-

cise reasonable and practicable care and diligence, considering all the existing circumstances and conditions, to supply its customers with such quantity and pressure of gas as their needs, when known to it, might require, and this without discrimination or favor. . . .

"To require a less measure of duty than we have defined would be unjust to the city and its people, and enable a gas company to defeat the very purpose that induced the city to grant the privilege of using and occupying its streets for the purpose of furnishing gas for heating purposes. It would also subject to great inconvenience, discomfort and expense the inhabitants of the city, who, acting on the reasonable belief that the company would render the contemplated service, had removed other means of providing heat and installed in their homes, factories and places of business the fixtures and appliances necessary to secure heat from the new source of supply. To secure for itself and its people means of obtaining heat was the only reason why the franchise was granted by the city, and there would be many times a gross failure to render the service contemplated if the gas company might use its own convenience or pleasure in determining the quality of its service. We do not, of course, mean to say that a gas company is under an absolute duty to furnish each or any of its customers the precise quantity of gas or the exact pressure needed by them, because it might not be reasonable or practicable for it to do this without discrimination, but if it knows the needs of a particular customer and the quantity and pressure of gas he requires in his business, it should furnish this quantity and pressure, if, by reasonable and practicable diligence and care under all the existing circumstances and conditions, it can do so without discrimination against other customers."

And in *City of Chicago* v. *Selz, Schwab & Co.* (1903), 202 Ill. 545, 67 N. E. 386, it was held that, where the

water system of a city was installed for the purpose of protection against fire and to supply the inhabitants with water, and water from a certain hydrant was sold to contractors for street-sprinkling purposes, the maintenance of the water system was not solely an exercise of the police power, so as to render the city exempt from liability for damage caused by the negligence of its servants in causing the hydrant in question to burst while they were attempting to repair it.

In *Brinkmeyer* v. *City of Evansville* (1867), 29 Ind. 187, the court, in discussing a city's liability, said: "A municipal corporation is, for the purpose of its creation, a government possessing to a limited extent sovereign powers, which, in their nature, are either legislative or judicial, and may be denominated governmental or public. The extent to which it may be proper to exercise such powers, as well as the mode of their exercise, by the corporation, within the limits prescribed by the law creating them, are, of necessity, entrusted to the judgment, discretion and will of the properly constituted authorities, to whom they are delegated. And being public and sovereign in their nature, the corporation is not liable to be sued, . . . in their exercise. But when duties of a purely ministerial character are expressly enjoined by law on such corporations, or arise by necessary implication, they are responsible for any damages resulting to individuals from a neglect to perform them, or from their performance in an improper manner."

And in *Aschoff* v. *City of Evansville* (1904), 34 Ind. App. 25, 72 N. E. 279, the court quoted the above statement from the Brinkmeyer case, and said that this rule "seems to be firmly established." And, in making its own observations, the court, at page 32, said: "Where the water system is conducted by the municipality in part for profit, even if principally for public purposes, the municipality is liable for damages caused by its

negligent management. *City of Chicago* v. *Selz, Schwab & Co.* (1902), 104 Ill. App. 376. And where it supplies water to its citizens and charges therefor, it acts in its private capacity, although such water-works system is also used for the extinguishment of fires. So acting, 'it stands on the same footing as would any individual or body of persons upon whom a like special franchise has been conferred.'"

In *Ross* v. *City of Madison* (1848), 1 Ind. 281, 48 Am. Dec. 361, the court said: "It may also be considered as settled that municipal corporations are responsible to the same extent and in the same manner as natural persons, for injuries occasioned by the negligence or unskilfulness of their agents in the construction of works for the benefit of the cities or towns under their government." And in *Starckhouse* v. *City of Lafayette* (1866), 26 Ind. 17, 89 Am. Dec. 450, the court, in speaking of the powers and liabilities of the city, said: "Many of the powers and duties of such corporations are in their nature legislative, and some are judicial, while others are purely ministerial. Where the duties imposed are of a legislative or judicial nature, and the proper exercise of them depends upon the judgment of those of whom they are required, the corporation is not responsible in damages, either for a failure to perform them, or for errors in their performance. But, where duties of a purely ministerial nature are positively enjoined on them by law, or arise by necessary implication, they are responsible for the damages resulting to individuals, either from a neglect to perform them, or from their performance in an improper manner."

In an action to recover damages caused by the flooding of the plaintiff's basement caused by the city's act in diverting surface water into the same sewer used by plaintiff, which sewer was too small to carry such waters, the court, in *Roll* v. *City of Indianapolis* (1876), 52 Ind.

547, in speaking of the liability of cities, said: "They are liable to individuals for wrongful acts, . . . whenever injury to private rights is the direct and natural consequence. . . . When liable, they are liable the same as individuals would be under the same circumstances."

In *City of Greencastle* v. *Martin* (1881), 74 Ind. 449, 39 Am. Rep. 93, where the city maintained a pound for certain animals, the court said: "For any negligence of its agents in the construction of the pound, or in any purely ministerial duty under the pound ordinance, the city is liable, just as a private person would be for the acts of his agents."

In upholding the plaintiff's right to sue in tort, even though there was a breach of a contract, the court, in *Stock* v. *City of Boston, supra,* said the fact the city had a contract with the plaintiff to supply him with water does not take away his right to sue in tort. "A mere breach of contract," said the court, "cannot be sued on as a tort, but for tortious acts, independent of the contract, a man may be sued in tort, though one of the consequences is a breach of his contract."

*Coy* v. *Indianapolis Gas Co.* (1897), 146 Ind. 655, 46 N. E. 17, 36 L. R. A. 535, held the breach of the contract to supply gas was a tort. In *Wood* v. *City of Auburn* (1895), 87 Me. 287, 32 Atl. 906, 29 L. R. A. 376, the court said: "The city, as a water company, cannot do as it will with its water. It owes a duty to each consumer. The consumer once taken on to the system, becomes dependent on that system for a prime necessity of business, comfort, health and even life. He must have the pure water daily and hourly. . . . The water must be supplied to the complainant, so long as he will promptly pay current installments and otherwise conform to the reasonable rules governing the supply of water."

In *Freeman* v. *Macon Gas & Water Co.* (1906), 126 Ga. 843, 56 S. E. 61, 7 L. R. A. (N. S.) 917, the court,

after discussing a statute which did not change the common-law duty to supply the citizens of the city with water, said: "For a breach of this statutory duty, the company could be held liable in tort by the aggrieved member of the public, though he was no party to the contract between the city and the water company. A private person may not only sue a public-service corporation for a breach of duty owing to him, but he may by mandamus even enforce the performance by the corporation of its public duty as to matters in which he has a special interest."

"The liability or nonliability of a municipality for its torts does not depend upon the nature of the tort, or the relation existing between the city and the person injured, or whether the city was engaged in the management of tangible property, but depends upon the *capacity* in which the city was acting at the time." *City of Kokomo* v. *Loy* (1916), 185 Ind. 18, 112 N. E. 994.

Appellant's contention that it was not liable to appellee at common law cannot be sustained. This contention of appellant is based upon the theory that, in furnishing water to private customers for private use, it was acting in the same capacity that it would have been acting in if it had been furnishing water to the public for fire prevention. All of the authorities cited by appellant in support of its contention are cases involving the liability of a city or public utility for damages for failure to provide proper fire protection, and are not in point. There is nothing in the Public Utility Act, Acts 1913 p. 167, that destroys or lessens the common-law liability of a municipality in an action of this character. The court did not err in overruling appellant's demurrer to the complaint.

The contention that the verdict is not sustained by sufficient evidence and that it is contrary to law raises the same questions, and will be considered together.

Appellee has owned and operated a number of greenhouses in the city of Huntingburg for a number of years. Appellant has for many years owned and maintained a system of water works for fire protection and for furnishing water to the inhabitants of the city for domestic and other purposes. In 1911, appellant extended a two-inch service pipe from a four-inch main in the street to appellee's greenhouses, and continuously thereafter furnished appellee with a sufficient supply of water and at a pressure sufficient to meet the demands and requirements of his business; the pressure furnished appellee being the same as was furnished all the other private consumers. Appellee's plant covered 16 acres of ground, on which were located nine greenhouses, covering two and a half acres. He had three steam boilers used for heating purposes. He had a refrigerator in which he kept cut flowers preparatory to marketing them. It was necessary for him to have water to heat his greenhouses in winter, to operate the refrigerator, and for sprinkling purposes. Among the insect pests with which appellee had to contend was a small red spider, and the only practical way of controlling it was by sprinkling with water two or three times a week. These spiders were kept under control by chilling, killing, and washing them off the plants by forceful spraying with water, and, in order to do this, it was necessary for appellee to have a water pressure of about 60 pounds to the square inch. It was also necessary for him to have this pressure in order to force the water into the boilers used in heating the greenhouses. From the time in 1911 when appellant connected appellee's greenhouses with its water system to March 14, 1924, it furnished appellee all the water required by him in connection with his business, and with a pressure of about 60 pounds to the square inch. In March, 1924, appellant extended the four-inch main, which had theretofore furnished

appellee with water, several hundred feet, and, on March 14, 1924, connected the main with a new water tank which had been constructed by the Southern Railway company for the purpose of storing water to supply its locomotives. This tank held about 100,000 gallons of water, and, when first connected with the water main, it took eight or 10 hours to fill it. This tank was lower than appellee's greenhouses, and was connected with the four-inch main by a six-inch opening controlled automatically by a six-inch valve. The opening and pipe from the tank through which the water ran when locomotives were being filled was 12 inches in diameter, and controlled by a 12-inch valve. From 20 to 40 locomotives were watered from this tank each day. While it took less than two minutes to furnish water for a locomotive, it took from 10 to 15 minutes to fill the tank from the four-inch main, after a locomotive took water.

In controlling the insect pest, it was necessary that the plants be sprinkled early enough in the day so that the plants would become dry before night. Appellant had knowledge of the requirements of appellee, and, without any notice or warning to appellee, connected the water main in question with the water tank at the railroad. After that connection was so made, March 14, there was a period of 16 days during which appellee was not able to get any water for heating or sprinkling purposes, except when the railroad was not taking water. As soon as the connection with the railroad tank was made, appellee notified appellant that he was getting no water, and informed appellant of the pending danger and the necessity of his having water with a sufficient pressure to get water into the boilers and for sprinkling purposes. Sixteen days, however, passed before appellant remedied the situation so as to provide appellee with water, as required in his business. During this time, as the result of appellant's acts and failure to

furnish appellee water, the red spiders got beyond appellee's control and damaged appellee, according to the verdict of the jury, in the sum of $9,000.

When appellant connected the four-inch water main to the water tank through a six-inch opening, it was bound to know that, when water was being taken into the tank through the six-inch opening, no other person depending on that main for water would be able to secure water for his requirements. It was bound to know that appellee would not during that time have any water for heating or sprinkling purposes. Appellant later connected the railroad tank with an eight-inch water main, located in another street, after which appellee secured a sufficient amount of water and with sufficient pressure, but this was not until he had been greatly damaged. Without extending this opinion by going into the details further or reviewing the evidence, we hold that the verdict is sustained by ample evidence and that it is not contrary to law.

The contention that the damages assessed are excessive cannot prevail. No good purpose will be served by reviewing the evidence bearing on this question. The amount of the recovery is well within the evidence.

The court gave to the jury 28 instructions, six on its own motion, 11 at request of plaintiff, and 11 at request of defendant. Appellant complains of each instruction so given, except those given at its request. We have given careful consideration to these complaints, and find no substantial merit in any of them.

No reversible error is shown in the admission of evidence. No question is presented concerning the refusal to give instructions.

Judgment affirmed.

ON PETITION FOR REHEARING.

McMahan, J.—Appellant insists that the trial court committed reversible error in admitting in evidence Exhibits A to J. The record discloses that, while appellee was testifying, certain plants were exhibited to and described by him. Some of these plants were in a healthy condition. Others showed the effect of being infested by red spiders. When and as Exhibits A to H were shown the witness, he was interrogated as to each of them, and, before the witness was cross-examined, each of them without objection was admitted in evidence. The witness was later cross-examined as to each exhibit. On re-examination, Exhibits I and J, which were other plants, one being healthy and the other showing the effect of the spider, were described, and the cause of the diseased condition of the one explained to the jury. Appellee was fully cross-examined as to Exhibits I and J. The only conclusion that can be drawn from the record is that each of these exhibits was before the jury at the time the witness was being interrogated. After I and J had been described by the witness, they were formally admitted in evidence, and, at the same time, Exhibits A to H were again formally offered, and, over appellant's objections, all of said exhibits were introduced in evidence. These exhibits are not, and of course could not be, certified to this court as a part of the record. The jury may have been allowed to inspect them, although the record does not show that fact. With this record before us, we again hold that no reversible error is shown in the admission of these exhibits.

Appellee in rebuttal was asked the amount of taxes paid by him in the spring of 1924. Appellant objected to this evidence on the ground it was not rebuttal; the objection being overruled, the wit-

ness said he paid between $800 and $900. No question as to the materiality and competency of the evidence is presented. The fact that it was admitted in rebuttal does not warrant a reversal.

Rehearing denied.