# FOR PUBLICATION

ATTORNEYS FOR APPELLANT
VEOLIA WATER INDIANAPOLIS LLC:

**MATTHEW W. MELTON**
**PETER A. SCHROEDER**
**CYNTHIA E. LASHER**
Norris Choplin Schroeder LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLANTS
CITY OF INDIANAPOLIS
DEPARTMENT OF WATERWORKS
AND CITY OF INDIANAPOLIS:

**KARL L. MULVANEY**
**BRIAN W. WELCH**
**CARL A. HAYES**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
INDIANA ASSOCIATION OF CITIES
AND TOWNS AND INDIANA
MUNICIPAL LAWYERS ASSOCIATION:

**KAREN L. ARLAND**
Ice Miller LLP
Indianapolis, Indiana

**JO ANGELA WOODS**
Indiana Association of Cities and Towns
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**ROBERT A. SMITH**
**ARY AVNET**
Smith & Wade, LLP
Noblesville, Indiana



FILED
Aug 03 2012, 9:03 am

CLERK
of the supreme court,
court of appeals and
tax court

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

| | |
|---|---|
| VEOLIA WATER INDIANAPOLIS LLC, | ) |
| CITY OF INDIANAPOLIS DEPARTMENT OF | ) |
| WATERWORKS, and CITY OF | ) |
| INDIANAPOLIS, | ) |
| | ) |
| Appellants-Defendants, | ) |
| | ) |
| vs. | ) No. 49A04-1108-PL-412 |
| | ) |
| NATIONAL TRUST INSURANCE COMPANY | ) |
| and FCCI INSURANCE COMPANY a/s/o | ) |
| ULTRA STEAK, INC. d/b/a TEXAS | ) |
| ROADHOUSE, | ) |
| | ) |
| Appellees-Plaintiffs. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Heather A. Welch, Judge
Cause No. 49D12-1010-PL-44624

**August 3, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

On January 4, 2010, there was a fire at a Texas Roadhouse restaurant ("the Restaurant") in Indianapolis.[1]  The Indianapolis Fire Department responded promptly, but discovered that the fire hydrants in the surrounding four blocks were frozen.  This allegedly

---

[1] The Restaurant is owned by Ultra Steak, Inc.

2

caused a delay of forty-five minutes in fighting the fire. Due to the delay, the Restaurant building was a total loss.

The Restaurant was insured by National Trust Insurance Company and FCCI Insurance Company (collectively, "the Insurers"). On October 7, 2010, the Insurers filed suit against the City of Indianapolis and its Department of Waterworks (collectively, "the City"), as well as Veolia Water Indianapolis LLC ("Veolia," collectively with the City, "the Appellants"), which at the time had a contract to operate the City's waterworks. The complaint alleged that the fire hydrants were frozen because the Appellants sold water from the hydrants to private companies, which had failed to properly close the hydrants after using them. The City filed a motion to dismiss, and Veolia filed a motion for judgment on the pleadings. Both motions claimed that the Appellants were entitled to immunity. The trial court denied the motions in part, concluding that the Appellants' commercial sale of water took their actions outside the scope of the common law immunity for firefighting. The trial court also found that the Insurers were third-party beneficiaries of Veolia's contract with the City.

We conclude that both the City and Veolia are entitled to common law immunity, because the common law rule turns on the purpose for which the water is being used, not the underlying cause of the lack of water. We further conclude that the explicit language of the City's contract with Veolia disavows any intent to create third-party beneficiaries. Therefore, we reverse.

3

## Facts and Procedural History

The Insurers filed a seventeen-count complaint against the Appellants, all based on the allegation that the hydrants froze due to use by private companies and/or unauthorized individuals who failed to properly close the hydrants.[2] The Insurers alleged that the Appellants did not supervise third-party use of the hydrants. The Insurers further alleged that the Appellants were aware that unauthorized individuals would steal water from the hydrants, yet failed to take measures to prevent unauthorized use. The Insurers also alleged that they are third-party beneficiaries to the City's contract with Veolia, which the parties refer to as the "Management Agreement."

In a recent case involving Veolia, we described Veolia's contractual relationship with the City as follows:

> For over one hundred years, the City of Indianapolis's ("City's") water utility was operated by the Indianapolis Water Company ("IWC"), a private company, through a franchise granted by the City. In 2001, the City created the Department of Waterworks ("the Department"); that same year, the City purchased IWC's assets and transferred management of the water utility to the Department.
>
> On March 21, 2002, the Department and U.S. Filter Operating Services, Inc., entered into a Management Agreement, transferring responsibility for the operation, management, and maintenance of the water utility to U.S. Filter. U.S. Filter later assigned the Management Agreement to USFilter Indianapolis Water, LLC, and this company later changed its name to Veolia. Under the Management Agreement, the City pays Veolia approximately $40 million per year, plus additional sums if Veolia meets certain incentives. Veolia,

---

[2] Count 1 alleged that Veolia was negligent in renting and in failing to supervise use of the hydrants. Count 2 alleged that Veolia breached its contract with the City. Count 3 alleged that Veolia breached the implied warranty of merchantability. Count 4 alleged that Veolia breached the implied warranty of fitness for a particular purpose. Count 5 alleged that Veolia breached a special duty. The remaining counts stated the same claims against the Department of Waterworks and the City and also alleged that the Department of Waterworks and the City were vicariously liable for Veolia's actions.

4

incorporated in Delaware, is a wholly-owned subsidiary of Veolia Water North America …, which in turn is a subsidiary of Veolia Environment …, a French corporation with multi-billion dollar annual revenues.

*Harrison v. Veolia Water Indianapolis, LLC*, 929 N.E.2d 247, 248-49 (Ind. Ct. App. 2010), *trans. denied*.[3]

The City describes the process for selling water from the hydrants as follows:

In the ordinary course of operating the water utility, Veolia licensed access to the City's hydrants to the City's customers who had a need for bulk water [such as pool or landscaping companies] so that those customers could purchase water by accessing hydrants located throughout the waterworks system. Sales through the hydrants were accomplished via temporary meters issued to the City's customers by Veolia. This program permitted licensees with proper equipment to access hydrants and draw off water from the hydrants for commercial purposes.

City's Br. at 5 (citations and footnotes omitted).[4]

On January 3, 2011, the City filed a motion to dismiss the Insurers' complaint on the basis that the City was entitled to statutory immunity for the performance of a discretionary function and common law immunity for firefighting. On the same date, Veolia filed an answer and motion for judgment on the pleadings, which argued that Veolia was entitled to

---

[3] According to Veolia's brief, in 2011, the City sold its water utility to Citizens Energy Group and passed an ordinance dissolving the Department of Waterworks.

[4] The City and Veolia both assert that all revenue, from the hydrants or otherwise, went to the City and not Veolia. *See* Veolia's Br. at 3 n.4 ("Although all allegations in the Insurers' Complaint are taken as true for purposes of this appeal, all revenue from the sale of water regardless of the point of sale at all times relevant to this action went to the [City] and not to [Veolia]."); City's Br. at 5 n.6 ("While licensing of access to hydrants generated revenue, it is not correct, as Plaintiffs allege, that Veolia made a profit from these activities. All revenue from the sale of water went to the [City]. Veolia was paid a base fee, a performance bonus, and was given the opportunity to make money on capital improvements.").

common law immunity to the same extent as the City.[5] On March 11, 2011, the trial court heard arguments on the motions. On June 10, 2011, the trial court issued an order partially granting and partially denying the City's motion to dismiss, as well as an order partially granting and partially denying Veolia's motion for judgment on the pleadings. The court found that the City was not entitled to immunity under the Indiana Tort Claims Act ("the ITCA"), which immunizes the "performance of a discretionary function." Ind. Code § 34-13-3-3(7). Specifically, the court found that the City's policy had been established by the Management Agreement, which required Veolia to maintain the hydrants, and the City had simply failed to execute that policy. The court further found that the City was not entitled to common law immunity because the "commercial sale of water [was] alleged to be the proximate cause for the failure of the infrastructure," and that activity is "outside the narrow scope of common law immunity granted … for firefighting purposes." Appellants' App. at 27. However, the court concluded that the City was entitled to common law immunity to the extent that the complaint was based on allegations of unauthorized use of the hydrants.

The trial court likewise found that Veolia had common law immunity as to the unauthorized use of hydrants, but not with respect to the commercial sale of water. In the order on Veolia's motion, the trial court highlighted several portions of the Management Agreement, then summarized them as follows:

---

[5] Veolia does not contend that it is entitled to immunity under ITCA. *See Harrison*, 929 N.E.2d at 252 (holding that Veolia was not a governmental entity or political subdivision for purposes of ITCA); *accord Metal Working Lubricants Co. v. Indianapolis Water Co.*, 746 N.E.2d 352, 355 (Ind. Ct. App. 2001) (stating in dicta that Indianapolis Water Co. was not a governmental entity as defined by ITCA).

6

> The Court, after reviewing the contract, finds that Veolia contracted specifically to: 1) provide full and complete; 2) accurate and safe water services to the citizens; 3) to purchase insurance to provide against all property damage that results from their failure to do so for property of others; and 4) to purchase insurance that has a waiver of governmental immunity. All of these contract terms could only be, and are intended to be, for the benefit of third parties.

*Id*. at 52. Thus, the court concluded that the Insurers were third-party beneficiaries to the Management Agreement.

The City and Veolia each filed motions to reconsider, and alternatively, motions to certify the trial court's June 10, 2011 orders for interlocutory appeal. The trial court denied the motions to reconsider, but granted the motions to certify the orders for interlocutory appeal. On September 21, 2011, we accepted jurisdiction of the appeal.[6]

## Discussion

On appeal, the City argues that it is entitled to immunity pursuant to both the ITCA and the common law. Veolia argues that it is entitled to common law immunity and that the trial court erred by determining that the Insurers were third-party beneficiaries to the Management Agreement. "The party seeking immunity bears the burden of establishing the immunity. If the evidence permits conflicting reasonable inference as to material facts, the

---

[6] We have also permitted the Indiana Association of Cities and Towns and the Indiana Municipal Lawyers Association to file a brief in support of the Appellants. According to their brief, the Indiana Association of Cities and Towns is a voluntary association of most of the State's cities and towns, and the Indiana Municipal Lawyers Association is a voluntary organization of approximately 348 municipal, county, and local government lawyers.

We held oral argument on June 19, 2012, in Indianapolis. We commend counsel on the quality of their advocacy.

7

governmental unit has failed to establish immunity." *Bules v. Marshall Cnty.*, 920 N.E.2d 247, 250 (Ind. 2010) (citation omitted).

### *Standards of Review*

The City appeals from the denial of a motion to dismiss for failure to state a claim upon which relief can be granted. Our review of a trial court's grant or denial of a motion to dismiss pursuant to Indiana Trial Rule 12(B)(6) is de novo. *Putnam Cnty. Sheriff v. Price*, 954 N.E.2d 451, 453 (Ind. 2011). A motion to dismiss tests the legal sufficiency of the complaint; that is, whether the allegations in the complaint establish any set of circumstances under which a plaintiff would be entitled to relief. *Trail v. Boys & Girls Clubs of Nw. Indiana*, 845 N.E.2d 130, 134 (Ind. 2006). We accept as true the facts alleged in the complaint, and consider the pleadings in the light most favorable to the plaintiff, drawing every reasonable inference in favor of the non-moving party. *Id*. However, we need not accept as true allegations that are contradicted by other allegations or exhibits attached to or incorporated in the pleading. *Id*.

Veolia appeals from a motion for judgment on the pleadings pursuant to Indiana Trial Rule 12(C). For purposes of the motion, Veolia is deemed to have admitted all well-pleaded facts. *Nat'l R.R. Passenger Corp. v. Everton by Everton*, 655 N.E.2d 360, 363 (Ind. Ct. App. 1995), *trans. denied*. "Like a motion to dismiss for failure to state a claim pursuant to Trial Rule 12(B)(6), a Trial Rule 12(C) motion attacks the legal sufficiency of the pleadings." *Id*. The standard of review is also de novo, and we draw all reasonable inferences in favor of the non-moving party. *Id*. "A judgment on the pleadings is proper only when there are no

genuine issues of material fact and when the facts shown by the pleadings clearly establish that the non-moving party cannot in any way succeed under the facts and allegations therein." *Eskew v. Cornett*, 744 N.E.2d 954, 956 (Ind. Ct. App. 2001), *trans. denied*. To the extent that interpretation of a contract is involved, "we may look to both the complaint and the attached contract for purposes of determining the appropriateness of the court's ruling on the motion for judgment on the pleadings." *Id*. at 957 (noting that Ind. Trial Rule 9.2(A) requires a written document upon which the action is premised to be attached to the complaint). When allegations of a pleading are inconsistent with terms of a written contract attached as an exhibit, the terms of the contract must prevail over a contrary allegation. *Id*.

### *Immunity: Historical Background*

The original common law rule in Indiana was that governmental units were immune from liability for their torts unless the court had recognized an exception. *Gates v. Town of Chandler*, 725 N.E.2d 117, 118 (Ind. Ct. App. 2000), *opinion on reh'g*, *trans. denied*. As early as 1867, our supreme court recognized the government's immunity for claims relating to the adequacy of fire protection. *See Brinkmeyer v. City of Evansville*, 29 Ind. 187, 193 (1867) ("It could not have been intended by the legislature, in conferring on the common council power to organize a fire department, that they should thereby undertake, absolutely, to prevent loss by fire in all cases, or become responsible as insurers in case of failure."). This included immunity from claims that there was an insufficient supply of water or water pressure. *Fitch v. Seymour Water Co.*, 139 Ind. 214, 218, 37 N.E. 982, 983-84 (1894).

In 1972, our supreme court decided *Campbell v. State*, 259 Ind. 55, 284 N.E.2d 733 (1972), in which it "reversed the common law presumption to provide that governmental units would be liable for any 'breach of a duty owed to a private individual,' that is to say, the duty to use ordinary and reasonable care under the circumstances." *Gates*, 725 N.E.2d at 118 (quoting *Benton v. City of Oakland City*, 721 N.E.2d 224, 227 (Ind. 1999)). However, *Campbell* identified three situations under which common law immunity would be retained:

> (1) where a city or state fails to provide adequate police protection to prevent crime; (2) where a state official makes an appointment of an individual whose incompetent performance gives rise to a suit alleging negligence on the part of the state official for making such an appointment; and (3) where judicial decision-making is challenged.

*Id.* at 118-19. In *Benton*, our supreme court clarified *Campbell* by stating:

> We hold that *Campbell* is properly applied by presuming that a governmental unit is bound by the same duty of care as a non-governmental unit except where the duty alleged to have been breached is so closely akin to one of the limited exceptions (prevent crime, appoint competent officials, or make correct judicial decisions) that it should be treated as one as well.

721 N.E.2d at 230.

In 1974, the General Assembly responded to *Campbell* by enacting the ITCA. The ITCA identifies twenty-four situations in which the State, its agencies, and its political subdivisions enjoy immunity. Ind. Code § 34-13-3-3. At issue in this case is paragraph 7, which provides immunity for the "performance of a discretionary function."

## I. Immunity under ITCA

"Ordinarily, the first step in determining governmental immunity is to look at the Tort Claims Act and decide if the entity is entitled to statutory immunity." *Metal Working*

10

*Lubricants Co. v. Indianapolis Water Co.*, 746 N.E.2d 352, 358 (Ind. Ct. App. 2001). If it is determined that the governmental defendant is not immune under the ITCA, the court then considers whether common law immunity exists. *Id.* The ITCA was enacted in derogation of the common law as established by *Campbell*, and therefore must be strictly construed against limitations on a claimant's right to bring suit. *Harrison*, 929 N.E.2d 247, 251 (Ind. Ct. App. 2010).

Veolia concedes that it is not entitled to immunity under the ITCA. The City, however, claims that it is immune pursuant to Indiana Code Section 34-13-3-3(7), which provides immunity for the "performance of a discretionary function." In *Peavler v. Board of Commissioners of Monroe County*, our supreme court adopted the planning/operational test for determining whether an act is discretionary:

> Under the planning/operational dichotomy, the type of discretion which may be immunized from tort liability is generally that attributable to the essence of governing. Planning activities include acts or omissions in the exercise of a legislative, judicial, executive or planning function which involves formulation of basic policy decisions characterized by official judgment or discretion in weighing alternatives and choosing public policy. Government decisions about policy formation which involve assessment of competing priorities and a weighing of budgetary consideration or the allocation of scarce resources are also planning activities.

528 N.E.2d 40, 45 (Ind. 1988) (citations omitted). "The critical inquiry is not merely whether judgment was exercised but whether the nature of the judgment called for policy considerations." *Id.* (internal quotation omitted).

The City compares this case to *Lamb v. City of Bloomington*, 741 N.E.2d 436 (Ind. Ct. App. 2001). *Lamb* concerned a fire at a Bloomington apartment complex that resulted in one

fatality and substantial property damage. The residents filed a complaint against the city, the mayor, the fire chief, and the fire department. The defendants filed a motion to dismiss, which the trial court granted. The residents appealed and we affirmed. After a lengthy discussion of common law immunity, we noted the pertinent provisions of the ITCA, and then found that each claim was barred by the ITCA, the common law, or both. Specifically, the following claims were found to be barred by Indiana Code Section 34-13-3-3(7):

> Count III, obstruction of firefighters' ability to act, alleges that before the fire, [the mayor and the fire chief] were informed that one of the fire trucks had "serious defects," yet neither remedied the "dangerous situation." The allegedly defective truck was one of the vehicles sent to the … fire. This count was properly dismissed as pertaining to a discretionary function under Indiana Code Section 34-13-3-3(7)[7].… Likewise, Count IV, which alleges that Bloomington, [the fire department], and [the fire chief] provided negligent instruction and/or training of the firefighters, was properly dismissed as relating to a discretionary function.

> ….

> Count VI, negligent maintenance of equipment, and Count VII, intentional failure to maintain equipment, allege that Bloomington and BFD "purchased certain and specific equipment to be used in the performance of 'fire protection' and 'fire suppression' in and around the City of Bloomington." These counts further allege that the Appellees "undertook a policy decision not to make needed repairs" to the equipment, hence resulting in damages to the Appellants. Both the common law, *see Gates*, 725 N.E.2d at 119-20, and Indiana Code Section 34-13-3-3(7) provide immunity to the Appellants for this discretionary policy decision.

> ….

> Count X, negligent performance of duties as fire chief, alleges that [the fire chief] failed to arrive on the scene of the … fire in a timely manner, should have removed defective equipment from active duty, made ill-advised

---

[7] At the time that *Lamb* was decided, the discretionary function provision was codified as subsection 6. We have replaced the outdated citations with current citations for ease of reading.

expenditures on training, clothing, and vehicles, and has been ineffective in increasing the number of firefighters. [The fire chief] is immune from suit for these actions in part by the common law and in part by Indiana Code Section 34-13-3-3(7). That is, some of the actions constitute the failure to provide adequate fire protection, while others represent discretionary acts.

*Id.*, 741 N.E.2d at 441-42.

The City argues that the Insurers' claims are similar to the *Lamb* plaintiffs' claim that the city was negligent in its failure to maintain and repair equipment. The City argues that, however characterized, the plaintiffs' claims relate to the formulation of policy, weighing of competing priorities, and allocation of scarce government resources.

The Insurers distinguish *Lamb* as follows:

This is not a policy decision as in *Lamb*, where the City may decide [that it] cannot, in tough economic times, maintain the waterworks infrastructure, which is necessary to the core government function of fire protection. Here, the City did not consciously make a decision to disregard the third-party vendor use of the hydrants due to lack of funds or any other reason. To the contrary, the City actually contracted for a high standard of care regarding its infrastructure from Veolia, as evidenced by the terms of the Management Agreement…. Thus the City simply failed to require Veolia to follow the terms of the Management Agreement or pre-determined policy. The City's negligence relates only to the failed execution of pre-determined policy; therefore, the City has failed to show that it is entitled to immunity under IC 34-13-3-3(7).

Appellees' Br. in Response to the City at 13.[8]

The reasoning of *Lamb* provides us with little guidance. Although *Lamb* was decided after *Peavler*, it does not mention the planning/operational test, but summarily labels certain

---

[8] The Insurers have filed two appellees' briefs, one in response to the City and one in response to Veolia. The Appellate Rules do not explicitly allow or prohibit the filing of separate briefs to respond to different parties. Our preference would have been for the Insurers to file a single brief and to request permission to file an oversized brief if necessary.

actions as "discretionary," referencing the ITCA. Although the issue of statutory immunity is generally resolved before considering common law immunity, in this case, there is a wealth of authority concerning the common law issue and very little guidance on the statutory issue. In this case, we feel it is prudent to resolve the case under the common law rather than the ITCA.

## II.  Common Law Immunity

### A.  Immunity for the City

As discussed above, our supreme court abolished common law immunity with three exceptions:

> (1) where a city or state fails to provide adequate police protection to prevent crime; (2) where a state official makes an appointment of an individual whose incompetent performance gives rise to a suit alleging negligence on the part of the state official for making such an appointment; and (3) where judicial decision-making is challenged.

*Gates*, 725 N.E.2d at 118-19 (citing *Campbell*, 259 Ind. at 62-63, 284 N.E.2d at 737)). There is also common law immunity for the breach of duties that are so closely akin to one of the limited exceptions that they should be treated as exceptions as well. *Id*. at 119 (citing *Benton*, 721 N.E.2d at 230).

The first appellate decision after *Campbell* to address common law immunity for fire protection was *Boyle v. Anderson Fire Fighters Ass'n Local 1262, AFL-CIO*, 497 N.E.2d 1073 (Ind. Ct. App. 1986), *trans. denied*. That case concerned a fire that occurred in Anderson while the city's firefighters were on strike. A few non-striking firefighters responded, but were unable to control the fire. They called for assistance from nearby fire

departments, but the striking firefighters initially prevented them from arriving at the site of the fire. Further adding to the chaos, one of the hydrants near the site of the fire was inoperable. While the fire was blazing, most of the property owners in the area were not allowed to enter to retrieve personal property. In the end, the fire destroyed half a city block. The landowners sued the city, the striking firefighters, and their unions. The trial court granted summary judgment for the city, and we affirmed, holding that the City was entitled to both statutory and common law immunity.[9] 497 N.E.2d at 1077-78. As to common law immunity, the *Boyle* court stated:

> Although the issue has not been addressed in many years, the common law in Indiana has long recognized that a municipality is not liable to an owner of property destroyed by fire even though the destruction may have resulted from the City's failure to provide suitable equipment or an adequate supply of water with which to fight the fire, i.e., insufficient water pressure, insufficient lengths of hose, or improperly functioning hydrants. *Larimore v. Indianapolis Water Co.*[,197 Ind. 457, 151 N.E. 333 (1926)]; *Trustees v. New Albany Waterworks*[, 193 Ind. 368, 140 N.E. 540 (1923)]; *Robinson v. City of Evansville*[, 87 Ind. 334 (1882)]. Nor is a city subject to liability for negligently failing to timely provide an adequate number of fire fighters who are competent to fight the fire and fit for duty. *Robinson*, *supra*. Thus, under the common law, the City cannot be held liable for its failure to maintain the fire hydrant or for its failure to provide an adequate alternative method for fighting the fire ….

*Id*. at 1077.

The next decision to consider common law immunity for firefighting was *Gates*. In that case, Dennis and Shelley Gates filed suit against the Town of Chandler Water Department based on the department's failure to maintain an adequate supply of water and

---

[9] As to statutory immunity, the *Boyle* court employed an analysis based on the discretionary/ministerial test, which our supreme court later rejected in favor of the planning/operational test.

water pressure to extinguish a fire at their home. The trial court granted summary judgment, and we affirmed. *Gates* framed the issue as "whether the duty is so closely akin to one of the limited exceptions (prevent crime, appoint competent officials, or make correct judicial decisions) identified in *Campbell* that it should also be recognized as an exception." 725 N.E.2d at 119. *Gates* held that fire protection was closely akin to police protection:

> Both services are essential for public safety, which is the primary function of government. Both are required to sustain a well-ordered society that values and protects the lives and property of its citizens. Police and fire protection rank together in the essential nature of the services provided. Government provides fire protection as an essential public service because fire, like crime, is a common enemy.
>
> Our decision today is consistent with Indiana common law as it existed both before and after *Campbell* which recognized that some vestige of governmental immunity must be retained. Essentially, we affirm the long recognized common law rule that a municipality is not liable to an owner of property destroyed by fire even though the destruction may have resulted from the failure to provide suitable equipment or an adequate supply of water with which to fight the fire, i.e., insufficient water pressure, insufficient lengths of hose, or improperly functioning hydrants. Nor is a municipality subject to liability for negligently failing to timely provide an adequate number of fire fighters who are competent to fight the fire and fit for duty.

*Id*. (citations omitted).[10]

The *Lamb* case discussed above quoted this portion of *Gates* with approval and held that several claims were barred by common law immunity: negligence in failing to timely respond to a fire alert, negligence in failing to extinguish the fire, failing to maintain equipment, negligence in failing to seek assistance from other fire departments, negligence on the part of the fire chief in the performance of her duties, and negligent staffing procedures and numbers. 741 N.E.2d at 441- 42.

*Gates* was again cited with approval in *O'Connell v. Town of Schererville*, 779 N.E.2d 16 (Ind. Ct. App. 2002). *O'Connell* concerned a fire that occurred in an apartment complex. Firefighters attempted to connect to three different hydrants, but none of them had sufficient water pressure to fight the fire. As a result, one building was completely destroyed, and another was partially destroyed. The residents sued the town. The trial court granted the

---

[10] *Gates* also relied on the following dicta in *Benton* that the provision of emergency services was similar to the exception in *Campbell* for crime prevention:

> We continue to believe that the duty to provide emergency services implicated in *Mullin* [*v. Municipal City of South Bend*, 639 N.E.2d 278 (Ind. 1994) (adopting the reasoning of *City of Rome v. Jordan*, 426 S.E.2d 861, 863 (Ga. 1993))] is sufficiently similar to the "prevent crime" exception in *Campbell* to raise the possibility of immunity. And we continue to believe that the *City of Rome* test is appropriate for determining whether a governmental unit qualifies for immunity for failure to dispatch emergency services (but only for that purpose).

> We acknowledge that this point appears to have been rendered moot by the passage of subsection (18) of Ind. Code § 34-4-16.5-3 [now Ind. Code § 34-13-3-3(19)], which grants a governmental entity immunity under the Tort Claims Act for the operation of "an enhanced emergency communication [or '911'] system." *Accord Barnes v. Antich*, 700 N.E.2d 262, 266 n.6 (Ind. Ct. App. 1998) (holding that "a plain reading of Ind. Code 34-4-16.5-3(18) leads inescapably to the conclusion that the legislature intended to afford immunity from claims arising out of a municipality's operation and use of [a '911' service]"), *transfer denied*.

*Benton*, 721 N.E.2d at 231 n.12.

town's motion for summary judgment on the basis of common law immunity for firefighting, and we affirmed. The *O'Connell* panel found that the case was "strikingly similar" to *Gates*. *Id*. at 20.

The residents attempted to frame the issue in terms of the town's maintenance of infrastructure:

> Relying on *City of Huntingburg v. Morgen*, 90 Ind. App. 573, 162 N.E. 255 (1928), they contend that because the negligence complained of was not the result of emergency personnel or firefighters extinguishing the fire, but instead was inadequate pressure from actual fire hydrants, this case concerns the Town's infrastructure.

*Id*. at 19.

In *City of Huntingburg*, the plaintiff owned commercial greenhouses, and the city failed to supply him with sufficient water pressure for his business needs. The plaintiff sued the city for the resulting damage to his plants. The city claimed that it was immune, but we disagreed, distinguishing between water supplied for fire protection and water supplied for consumption:

> It is generally held that a municipal corporation, in enacting an ordinance for protection against fire and in the maintenance of a fire department and system of water works for that purpose, acts in a governmental capacity in the general interest of the community, and that the municipality is not liable to a property owner for damages caused by fire. Nor is a public utility company, owning and operating a system of water works for the furnishing of water to private consumers, and for the protection of the public from fire, under a franchise or contract with the municipality, liable to a property owner for loss of property by fire caused by insufficient water pressure. A city maintains waterworks for the twofold purpose of fire protection and for supplying water to its inhabitants for daily consumption. As to the city's liability for the default or negligence of its employees in maintaining such waterworks, there is a clear line of demarcation between its liability, depending on the purpose for which the water system is being used.

18

The first purpose, that of fire protection, is clearly a discretionary or governmental act. For the default or negligence of the city's employees in relation to fire protection the city is not liable. However, in supplying water to the inhabitants of the city for daily consumption, the well-established rule is that the city is liable on the same principle that a private corporation engaged in the same business is liable.

*City of Huntingburg*, 90 Ind. App. at 577-78, 162 N.E. at 257.

*O'Connell* distinguished *City of Huntingburg*, stating: "[T]he malfunctioning hydrants do not present an issue of private, commercial use of water. Rather, our facts are the opposing comparison used by the *City of Huntingburg* court as an example of well-settled immunity: supplying water to the public for fire protection." 779 N.E.2d at 19. Therefore, we held that the town had common law immunity. *Id*. at 21.

In *City of Peru v. Lewis*, 950 N.E.2d 1 (Ind. Ct. App. 2011), *trans. denied*, we again followed *Gates*. In that case, Tracy Lewis called 911 and reported that her house was on fire and that she and her children were inside, but would attempt to get out of the house. When the fire department arrived, it did not immediately search for people inside the burning house. One child died in the fire, and Lewis and the rest of her children were injured. Lewis sued the city, and the city moved for summary judgment on the grounds that it was immune from suit. The trial court denied summary judgment, but we reversed. After discussing *Gates* and *Lamb*, we stated:

When examining the various circumstances that were presented in these cases, we acknowledge that there is virtually no limit to the types of claims that citizens might advance concerning municipal inadequacies in providing adequate fire protection, such as adequate staffing, inadequate training, etc. As discussed above, the Lewises contend that the fire department was negligent in supplying fire protection without making a search for fire victims

19

> a priority; by favoring ventilation of the house instead of searching for victims; and by not communicating to firefighters that people might be in the house, which communication might have caused them to make potential rescue a more urgent priority once the first floor fire was under control. In our view, these allegations—however characterized—fall within the ambit of the failure to provide adequate fire protection and are subject to common law immunity in accordance with *Lamb* and *Gates*….

*Id*. at 6. Therefore, we held that the trial court should have granted the city's motion for summary judgment. *Id*.

The Insurers assert that their precise argument – that the lack of water was caused by commercial activity – has not been addressed before. Although they appear to be technically correct, Indiana decisions regarding firefighting immunity have long drawn a clear line based on the purpose for which the water is being used – for firefighting or for other purposes. *See*, *e.g.*, *City of Huntingburg*, 90 Ind. App. at 578, 162 N.E. at 257 ("As to the city's liability for the default or negligence of its employees in maintaining such waterworks, there is a clear line of demarcation between its liability, depending upon the purpose for which the water system is being used."); *Gates*, 725 N.E.2d at 119 (noting that "*Campbell* is properly applied by presuming that a governmental unit is bound by the same duty of care as a non-governmental unit" unless the duty allegedly breached "is so closely akin to one of the limited exceptions (prevent crime, appoint competent officials, or make judicial decisions) that it should be treated as one as well" and concluding that firefighting was such an exception); *Metal Working*, 746 N.E.2d at 359 ("It is not the provision of water *per se* that entitles IWC to immunity; it is the narrow function of providing water and equipment for fire protection services that entitles IWC to the limited common law immunity granted by

*Campbell*."); *O'Connell*, 779 N.E.2d at 19 ("Our case is distinguishable from *City of Huntingburg* because the malfunctioning hydrants do not present an issue of private, commercial use of water. Rather, our facts are the opposing comparison used by the *City of Huntingburg* court as an example of well-settled immunity: supplying water to the public for fire protection."); *Lamb*, 741 N.E.2d at 439 (rejecting plaintiffs' argument that "many of the counts in their complaint 'pertained to matters set in place prior to the "fire" in question and are not, in and of themselves, pertaining to actions taken on the day of the fire'"). None of these cases suggest that the underlying cause of the lack of water to fight a fire is pertinent to the immunity analysis. We must agree with the City that the factual scenario in this case fits squarely within the immunity that we have afforded to governmental entities for fire protection services. Therefore, we reverse the trial court's ruling that the City is not entitled to common law immunity.

### B. Common Law Immunity for Private Entities

Relying on *Metal Working*, Veolia contends that it is entitled to common law immunity to the same extent as the City. In *Metal Working*, a fire started at Metal Working's facility. A nearby shut-off valve had been closed, leaving an inadequate supply of water to fight the fire. Metal Working sued the Indianapolis Water Company for negligent failure to inspect and maintain the water mains servicing the hydrants in the vicinity of Metal Working's property. The water company filed a motion for summary judgment on the grounds that it had immunity, which the trial court granted, and Metal Working appealed.

The water company conceded that it was not a governmental entity as defined by the ITCA. *Metal Working*, 746 N.E.2d at 358. However, we observed that when private entities are "endowed by the state with powers or functions governmental in nature, they become agencies or instrumentalities of the state and are subject to the laws and statutes affecting governmental agencies and corporations." *Id.* at 356 (quoting *Ayres v. Indian Heights Volunteer Fire Dep't, Inc.*, 493 N.E.2d 1229, 1235 (Ind. 1986)). We noted that firefighting "is a service that is uniquely governmental. The need to control, prevent, and fight fires for the common good of the community has been universally accepted as a governmental function and duty in this state.…" *Id.* (quoting *Ayres*, 493 N.E.2d at 1235). We further noted that "the business decisions that private companies can usually make without outside interference, such as expansion plans and rate-making, are subject to governmental controls when it comes to [the water company]." *Id.* at 357. We concluded that the water company was entitled to common law immunity because if the water company did not provide water to the city and its citizens, then the city itself would; in other words, the water company was acting in the government's stead:

> We note that considering [the water company] to be a governmental entity and giving [it] immunity in this circumstance causes no harm to the citizens, because if a private company did not provide the water services, then the government would, and pursuant to *Gates*, the government would unquestionably be immune under the same circumstances.

*Id.* at 359. *See also Harrison*, 929 N.E.2d at 252 (although holding that Veolia was not entitled to statutory immunity, panel stated that it did "not necessarily disagree with the ultimate holding of the *Metal Working* case, namely that a water utility cannot be liable on a

22

claim that it failed to provide adequate water for firefighting purposes"); *Larimore*, 197 Ind. at 459, 151 N.E. at 334 (at common law, a water company with a contractual duty to supply water to a city is not liable for fire losses due to lack of sufficient water to fight the fire); *New Albany Waterworks*, 193 Ind. at 375, 140 N.E. at 543 (a water company is not "an insurer of any individual citizen and tax-payer against loss by fire" because "the consideration for [supplying water] is totally inadequate upon which to presume that any such duty was contemplated by the parties").

The Insurers do not explicitly argue that Veolia is not entitled to common law immunity even if the City is. Given the long-standing precedent that water companies have immunity to the same extent as the municipality with which they have contracted, we must agree with Veolia that it is also entitled to immunity.

Although we feel bound by settled precedent to hold that both the City and Veolia are entitled to immunity, we must acknowledge that the Insurers have presented several cogent reasons for reconsidering this policy. Although Veolia was acting in the City's stead, Veolia is a for-profit company and is not directly accountable to voters and taxpayers. Veolia presumably earned some profit from operating the waterworks; otherwise, it would have no reason to be in business. *Compare Ayres*, 493 N.E.2d at 1237 (holding that volunteer fire department was an instrumentality of the state, and therefore entitled to immunity, in part because the contract price was nominal), *with Harrison*, 929 N.E.2d at 253 (in declining to find Veolia a governmental entity covered by ITCA, we noted that "one of the main concerns ITCA intended to address clearly was protection of the public treasury from a multitude of

tort lawsuits," a concern not applicable to Veolia, which is a for-profit enterprise that is "part of a multi-national, multi-billion dollar conglomerate"). A city operating its own waterworks would not necessarily seek to earn any profit. In addition, if the City operated the waterworks itself, dissatisfied citizens could attempt to redress problems through the political process; however, citizens cannot "vote out" Veolia or any of its employees. On the contrary, the Management Agreement was for a term of twenty years, potentially long after the officials who granted Veolia the contract would be out of office.

Veolia had a contractual obligation to maintain the City's waterworks and also had responsibilities to consumers, for example, to maintain appropriate water pressure, as in *City of Huntingburg*. Veolia already had a responsibility vis-à-vis the City and consumers to keep the waterworks system in good repair, and it is not obvious on the record before us that substantial additional maintenance work would have been required to keep that same system in good repair for firefighting purposes. Nor is it obvious that Veolia would face staggering liability if it lacked immunity. The Management Agreement required Veolia to carry insurance to cover "all claims arising from injuries to members of the public or damage to property of others." Management Agreement at 61. The cost of this insurance presumably was taken into account when the contract price was negotiated and when the rates were set by the Indiana Regulatory Commission. Moreover, the specter of liability would provide incentive to keep hydrants in good repair.

The commercial sale of water from hydrants is supposed to benefit consumers by lowering rates. Veolia had a contractual obligation to monitor the use of and to maintain

24

those hydrants. The primary function of the hydrants is to provide water for fire suppression. Immunity is intended to insure that the government can continue to provide essential safety services, because exposing government entities to liability for fire damages could discourage them from providing fire protection services. Insulating Veolia from liability for its alleged failure to monitor or maintain in this case may actually create a disincentive to maintain hydrants.

Our supreme court has not addressed immunity for firefighting in recent years.[11]  Since then, public-private contracts have not only become more prevalent, but they are also much more complex than contemplated by cases such as *New Albany Waterworks*.  In this case, the Management Agreement is a multi-million-dollar contract containing detailed provisions spanning ninety-two pages, accompanied by a ninety-nine-page amendment and fifteen exhibits.  Although the common law rule is easy to apply, it takes the focus off whether the government action is the type that ought to be immunized and instead places it on the type of damage caused, i.e., damage from fire.  Were we writing on a clean slate, we might adopt a different rule; however, we are bound by supreme court precedent.  *See Jones v. State*, 749 N.E.2d 575, 582 n.4 (Ind. Ct. App. 2001) (noting that "we are not at liberty to ignore the precedent of our Supreme Court"), *trans. denied*.  Therefore, we reverse the trial court's ruling that Veolia is not entitled to common law immunity.

---

[11]  The most recent supreme court case to discuss immunity for firefighting is *Ayres*, which was decided in 1986.  In *Ayres*, the supreme court stated that it was "in total accord with the Court of Appeals" on the issue of statutory immunity and briefly discussed *City of Hammond v. Cataldi*, 449 N.E.2d 1184 (Ind. Ct. App. 1983), a case which applied the now outdated discretionary/ministerial test; transfer was granted primarily to address a different issue.  *Ayres*, 493 N.E.2d at 1234.  Prior to *Ayres*, the last supreme court to address immunity for firefighting was *Larimore*, decided in 1926.

### III. Third-Party Beneficiary

Veolia argues that the trial court erred by finding that the Insurers were third-party beneficiaries to the Management Agreement and therefore could pursue a breach of contract claim.

> Generally, only parties to a contract or those in privity with the parties have rights under the contract. However,

>> One not a party to an agreement may nonetheless enforce it by demonstrating that the parties intended to protect him under the agreement by the imposition of a duty in his favor. To be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed.

> The intent of the contracting parties to bestow rights upon a third party "must affirmatively appear from the language of the instrument when properly interpreted and construed." However, it is not necessary that the intent to benefit a third party be demonstrated any more clearly than the parties' intent regarding any other terms of the contract.

*OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1314-15 (Ind. 1996) (citations omitted).

When interpreting a contract, we read the contract as a whole and attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless. *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 213 (Ind. Ct. App. 2007). "Likewise, we must accept an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict." *Id*. Unless the terms of a

contract are ambiguous, they will be given their plain and ordinary meaning. *Brockman v. Brockman*, 938 N.E.2d 831, 834 (Ind. Ct. App. 2010), *trans. denied*.

> Terms are not ambiguous merely because the parties disagree as to the proper interpretation of those terms. By contrast, contract terms may be ambiguous if they are susceptible to more than one reasonable interpretation. If a written instrument is ambiguous, we may consider all relevant evidence, including extrinsic evidence, to discern the contract's meaning.

*Id.* (citations omitted).

Veolia argues that the third-party beneficiary issue is irrelevant because it has immunity. In support, Veolia cites *Giles v. Brown County*, 868 N.E.2d 478 (Ind. 2007). Annette Giles sued Brown County because her husband, Joey, died after the county failed to dispatch an ambulance in response to his 911 call. The county had a contract with Columbus Regional Hospital to provide emergency medical services to all Brown County residents. However, when Joey called 911 and reported that he was experiencing chest pains and shortness of breath, none of the ambulances reserved for Brown County were available. Columbus Regional Hospital asked Bloomington Hospital to dispatch an ambulance. An ambulance arrived from Bloomington about forty-five minutes later, and Joey died shortly thereafter.

Giles's theory was that she was a third-party beneficiary of the contract between Brown County and Columbus Regional Hospital. Brown County sought immunity under the ITCA on the ground that Joey's death resulted from the "operation" or "use" of an enhanced emergency communications system. Ind. Code § 34-13-3-3(19). Our supreme court agreed,

and further held that this immunity trumped Giles's claim that she was a third-party beneficiary to the contract:

> Immunity assumes negligence but denies liability. Thus, the issues of duty, breach and causation are not before the court in deciding whether the government entity is immune. If the court finds the government is not immune, the case may yet be decided on the basis of failure of any element of negligence. This should not be confused with the threshold determination of immunity.

*Giles*, 868 N.E.2d at 480 (quoting *Peavler*, 528 N.E.2d at 46-47).

The Insurers counter by arguing that Veolia waived its right to immunity in the Management Agreement.[12] In support, the Insurers point to Section 8 of the Management Agreement, which requires Veolia to purchase certain types of insurance coverage, including comprehensive general liability insurance with a provision for waiver of immunity:

> Section 8.01 Insurance Procurement; Duty to Maintain; Obligation to Provide Continuous Coverage.
>
> (a) Procurement. Throughout the term of this Agreement the Company, on its own behalf and on behalf of any one directly or indirectly employed by it for whose acts or omissions it may be liable, shall secure, or cause to be secured, and maintain, at its cost and expense, including premium payments, the following insurance policies with the below specified policy limits. Cost and expense, including premium payments, will be separately identified but included in the Service Fee.
>
> …

---

[12] Veolia argues that the Insurers waived their argument that immunity was contractually waived by not raising it in the trial court. "Issues not raised at the trial court are waived on appeal. In order to properly preserve an issue on appeal, a party must, at a minimum, show that it gave the trial court a bona fide opportunity to pass upon the merits of the claim before seeking an opinion on appeal." *Cavens v. Zaberdac*, 849 N.E.2d 526, 533 (Ind. Ct. App. 2006). Much of the Insurers' argument to the trial court on this issue was not transcribed because the audio recording was unintelligible. Although it is unclear what the Insurers' precise argument was, it is clear that the trial court did consider the issue; therefore, we decline to find the issue waived.

(3) Comprehensive General Liability. Commercial general liability insurance to protect the Company against all claims arising from injuries to members of the public or damage to property of others, including loss of the use of tangible property damaged, arising out of any act or omission of the Company or its agents, employees or subcontractors.… Comprehensive general liability coverage shall contain the following provisions:

…

(N) include waiver of government immunity;

Management Agreement at 55-57.[13]

While we are somewhat puzzled as to the intended purpose of this language, we must agree with Veolia that it does not *require* Veolia to waive its immunity. Even if immunity were waived, Section 13.18 of the Management Agreement explicitly disavows any intent to create third-party beneficiaries:

Section 13.18 Third Party Beneficiary. This Agreement is intended to be solely for the benefit of Company and Department and their successors and permitted assigns and is not intended to and shall not infer any rights or benefits on any third party not a signature hereto, except as specifically set forth herein.

*Id*. at 87.

In *Indiana Gaming Co. v. Blevins*, 724 N.E.2d 274 (Ind. Ct. App. 2000), *trans. denied*, we held that a similar contractual provision trumped language that might otherwise be construed to create third-party beneficiaries. In that case, the City of Lawrenceburg and Indiana Gaming entered into a contract to develop and operate a riverboat gaming operation

---

[13] The Management Agreement has been provided to us in PDF format on a disc. Because the first few pages of the Management Agreement are numbered with romanettes, the numbers on the document do not correspond with the page number that must be entered into the PDF reader to jump to the relevant text. We will cite to the number needed to jump to the quoted text.

in Lawrenceburg. The contract stipulated that each laborer or mechanic shall be paid a wage equal to the union contract wage in the Lawrenceburg area. Some archaeologists working on the project and their union, United Archaeological Field Technicians International Union of Operating Engineers, sued Indiana Gaming, contending that they were being paid less than the contract required. They argued that they were third-party beneficiaries of the contract between Indiana Gaming and the city.

Indiana Gaming filed a motion to dismiss, relying on Section 15.21 of the contract, which stated, "*No Third-Party Beneficiaries.* Nothing in this Agreement shall be construed as creating any rights or entitlement that inure to the benefit of any person or entity not a party of this Agreement (except Guarantor)." *Id*. at 278. The trial court denied the motion to dismiss, but we reversed, stating, "This language clearly and unambiguously precludes the Technicians from being third-party beneficiaries under the Agreement." *Id*. We stated that our interpretation of the contract did not render the wage provisions meaningless, but merely limited the enforcement of those provisions to certain individuals. *Id*. at 279. On the other hand, allowing the suit to go forward would render Section 15.21 meaningless. *Id*.

In *Plummer v. Consolidated City of Indianapolis*, 1:03-CV-00567-DFH-WT, 2004 WL 2278740 (S.D. Ind. Aug. 17, 2004), the Southern District of Indiana interpreted the same Management Agreement at issue here. In *Plummer*, several USFilter Employees brought ERISA claims against the City. The court rejected the employees' claim that was based on a third-party beneficiary theory:

> There is … no contradiction between having the City and USFilter agree on one hand that … employees should be treated in a particular way, and having

30

the contracting parties also agree that they do not intend to confer legally enforceable rights on those employees under the contract. Contracting parties often recognize that their agreement may affect the interests of others who are not parties to the contract. They may expressly acknowledge those effects in the contract. They may even extract promises from one another concerning those effects. But it is a very different thing for the contracting parties to bestow upon those third parties the right to sue the contracting parties to enforce those promises. That prospect of third-party enforcement is exactly why disclaimers like Section 13.18 are inserted into contracts like the Management Agreement, especially since courts might otherwise imply from the agreement an intent to confer third-party benefits. *See*, *e.g.*, *Barth Elect. Co. v. Traylor Bros., Inc.*, 553 N.E.2d 504, 506 (Ind. App. 1990) (reversing dismissal of construction prime contractor's claim to be third party beneficiary where contract lacked an explicit disclaimer of intent to confer such rights).

*Id*. at *17.

The Insurers rely on two cases that have held that members of the general public were third-party beneficiaries of a city contract: *Freigy v. Gargaro Co.*, 223 Ind. 342, 60 N.E.2d 288 (1945) (holding that a contractor's contract with the City of Fort Wayne to construct a sewer authorized a homeowner damaged by the construction work to pursue a cause of action against the contractor), and *City of Indianapolis v. Kahlo*, 938 N.E.2d 734 (Ind. Ct. App. 2010) (holding that citizens of Indianapolis were third-party beneficiaries of contract that required a portion of the Pan Am Plaza to remain open to the public), *trans. denied*. However, neither of the contracts at issue in those cases contained a specific provision disavowing any intent to create third-party beneficiaries. *Indiana Gaming* is more directly on point, and although we are not bound by *Plummer*, we find its reasoning to be persuasive. Therefore, we conclude that the trial court erred by finding that the Insurers were third-party beneficiaries of the Management Agreement.

### *Conclusion*

Pursuant to long-standing precedent, common law immunity bars claims for fire damages stemming from an inadequate supply of water or inoperable fire hydrants. This immunity applies both to the City and to Veolia. We also conclude that Veolia did not waive its immunity, and even if it had, the explicit terms of the contract indicate that the Insurers are not third-party beneficiaries of the Management Agreement. We therefore reverse the judgment of the trial court.

Reversed.

VAIDIK, J., and BRADFORD, J., concur.